# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTHONY JACKSON,                            :
Individually and on behalf of All Others    :
Similarly Situated,                         :            CIVIL ACTION
                                            :
                        Plaintiffs,         :
                                            :
        v.                                  :
                                            :
SOUTHEASTERN PENNSYLVANIA                    :            NO.  08-4572
TRANSPORTATION AUTHORITY                     :
                                            :
                        Defendant.          :

## MEMORANDUM

BUCKWALTER S. J.                                        March 10, 2009

Currently pending before the Court is a Motion by Plaintiff Anthony Jackson to file a Second Amended Complaint, and the Response thereto of Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA").  For the following reasons, the Motion is granted.

## I.      FACTUAL BACKGROUND

The crux of Plaintiff's proposed Second Amended Complaint challenges Defendant's "Criminal Record Policy," which effectively prohibits SEPTA, and all of its paratransit service providers, from hiring any person with a criminal record, including felony or misdemeanor convictions, without allowing any inquiry into the circumstances of the conviction.  (Sec. Am. Compl. ¶ 29.)  Plaintiff alleges that, for many years, Defendant SEPTA has "intentionally imposed [these] screening standards and practices on applicants for jobs as drivers with SEPTA and its paratransit subcontracting companies . . . that have had a disparate impact on African American job

applicants and employees with older criminal offenses that have no bearing on the ability of the individual in question to safely and appropriately carry out the responsibilities of a SEPTA bus driver or a paratransit driver."  (Id. ¶ 4.)  The resulting disparate impact from this policy was purportedly "brought to light" by a prior judicial ruling challenging the identical policy.  (Id. ¶ 7 (citing Douglas El v. SEPTA, 418 F. Supp. 2d 659 (E.D. Pa. 2005).)  Nonetheless, over the years SEPTA has "intentionally selected, instituted and reaffirmed" this "Criminal Record Policy" precisely because of its adverse effects on African-Americans.  (Id. ¶ 7.)

According to the facts alleged in the Amended Complaint, Plaintiff Anthony Jackson, at the time relevant to this litigation, was a forty-four year old African-American male with a five-year employment history driving vans, trucks, and paratransit vehicles.  (Id. ¶ 20.)  Jackson had a criminal history consisting of:  (1) misdemeanor convictions for indecent assault and exposure stemming from a November 1993 incident, and resulting in three years probation; (2) an arrest for an incident occurring in 2000, for which the charges were dismissed; and (3) an arrest for an incident occurring in 2001, for which the charges were *nolle prossed*.  (Id.)

In 2002, Plaintiff first applied for a position as a bus driver with SEPTA.  (Id. ¶ 21.)  Although he passed all required testing, he was denied employment based solely on his past criminal history.  (Id.)  Subsequently, in early 2003, Plaintiff accepted employment with Triage, Inc. ("Triage"), a paratransit provider who contracts with SEPTA.  (Id. ¶¶ 9, 22.)  In late 2004, during his employment with Triage, Plaintiff again applied for a position with SEPTA as a bus driver.  (Id. ¶ 33.)  After again passing the required testing, he was not hired due to his past criminal record.  (Id.)  Plaintiff remained employed with Triage until 2005, when he was laid off due to the company's financial difficulties.  (Id. ¶ 22.)

In August 2005, Plaintiff began working as a paratransit driver for SEPTA paratransit

2

subcontractor First Transit.  (Id. ¶ 34.)  As part of his employment application, Plaintiff revealed the full extent of his criminal history.  (Id. ¶ 35.)  Despite his background, Plaintiff was hired and worked for First Transit without incident until 2006, when a SEPTA supervisor informed him of a change in SEPTA's policy that barred persons with criminal convictions from employment.  (Id. ¶ 36.)  The supervisor told Plaintiff, however, that under a "grandfather clause" and because he was an active employee in good standing, he would not be terminated.  (Id.)

    In 2007, during his employment with First Transit, Plaintiff applied a third time for a position with SEPTA as a bus driver and was again denied employment based on his past criminal record.  (Id. ¶ 37.)  Thereafter, on December 13, 2007, Plaintiff received a call from his supervisor at First Transit, informing him that, due to a change in SEPTA's employment policy, Plaintiff was being terminated, at SEPTA's directive, solely because of his prior criminal record.  (Id. ¶ 38.)  Since that date, Plaintiff has remained unemployed.  (Id. ¶ 41.)

## II.    PROCEDURAL HISTORY

    On September 19, 2008, Plaintiff filed a class action complaint challenging the disparate impact of SEPTA's Criminal Record Policy under 42 U.S.C. § 1981, but including scant reference to any intentional discrimination by SEPTA.  Following SEPTA's November 19, 2008, motion to dismiss on the ground that the disparate impact theory of discrimination is not available under 42 U.S.C. § 1981, Plaintiff filed an Amended Complaint dated December 15, 2008.  In that Amended Complaint, Plaintiff included a single count, under 42 U.S.C. § 1981, alleging intentional discrimination by SEPTA against Africa-Americans.

    On December 31, 2008, Defendant moved to dismiss the Amended Complaint, asserting that Plaintiff had failed to properly plead a cause of action for intentional discrimination.  Plaintiff responded on January 14, 2009, and Defendant filed a reply brief on January 26, 2009.  Before this

Court had the opportunity to rule on the motion, the Third Circuit handed down its decision in

McGovern v. City of Philadelphia, 554 F.3d 114 (3d Cir. 2009).  In that opinion, the court held that

"the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy

for violation of the rights guaranteed in § 1981 by state governmental units."  Id. at 121 (quoting Jett

v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)).  By way of letter dated February 16, 2009,

Defendant requested that the Court dismiss Plaintiff's Amended Complaint on the basis of the

McGovern decision.

Four days later, on February 20, 2009, Plaintiff, apparently acknowledging the import of

McGovern, submitted the current Motion for Leave to File a Second Amended Complaint.  The sole

count in the proposed Second Amended Complaint asserts a violation of 42 U.S.C. § 1981, which

Plaintiff seeks to enforce pursuant to 42 U.S.C. § 1983, as follows:

> 56.    Defendant SEPTA violated the provisions of the Civil Rights Act of 1871, as
> amended, 42 U.S.C. § 1983, in that Defendant, acting under color of law,
> deprived Jackson and all other similarly situated African American job
> applicants, of the privileges and immunities secured to them by the
> Constitution and laws of the United States and the Commonwealth of
> Pennsylvania, and, in particular, that they deprived them of property without
> due process by, inter alia, maintaining a criminal record policy that mandates
> terminating the employment and/or denying employment to individuals based
> solely on their criminal records without allowing any inquiry into when the
> conviction occurred, the circumstances surrounding the conviction, or whether
> the conviction has any relationship to the responsibilities of the position
> sought.

> 57.    Defendant SEPTA further violated the provisions of the 42 U.S.C. § 1981 in
> that they discriminated against Plaintiff on account of his race and interfered
> with Plaintiff's rights to make an enforce contracts, based on his race, as
> evidenced by, inter alia:

> (a)    Defendant SEPTA committed intentional, purposeful, deliberate, repeated,
> and ongoing violations of 42 U.S.C. § 1981 by requiring its paratransit
> providers to deny employment to all persons with criminal records, including
> misdemeanor or felony convictions, arrest or diversionary program
> resolutions, without considering how long ago the criminal behavior occurred,

        the circumstances surrounding the criminal behavior, the relation between the criminal behavior and the position sought (or held);

(b)      Defendant SEPTA committed intentional, purposeful, deliberate, repeated, and ongoing violations of 42 U.S.C. § 1981 through the termination and/or denial of Plaintiff's employment pursuant to Defendant SEPTA's uniform employment policies and practices;

(c)      Defendant SEPTA created and imposed its uniform employment policies and practices both knowing and intending that it would work to exclude anyone with a prior criminal record from being able to secure employment with any paratransit provider in Philadelphia or the four surrounding suburban counties;

(d)      Defendant SEPTA intentionally and purposefully created, imposed, reinstituted and maintained its uniform employment policies and practices both knowing and intending that it would adversely impact African American job applicants from being able to secure employment as a bus driver with SEPTA itself and with any paratransit provider in Philadelphia or the four surrounding suburban counties.

(e)      At all relevant times, Defendant SEPTA has been a controlling person with respect to all of its paratransit providers, and was responsible for dictating the terms under which the providers hired and fired their employees; and

(f)      As a direct and proximate result of the foregoing conduct of Defendant SEPTA, Plaintiff Jackson has suffered damages, including but not limited to lost wages (including back pay and front pay), lost fringe benefits, lost training, lost pension benefits, pain, suffering, humiliation, and mental anguish.

(Sec. Am. Compl. ¶¶ 56-57.)  On March 9, 2009, Defendant filed an Opposition to Plaintiff's Motion for Leave to Amend, claiming that the proposed amendment should be denied on the grounds of futility.  In its supporting Memorandum of Law, Defendant sets forth an almost verbatim recitation of its Motion to Dismiss the Amended Complaint.  The Court now turns to the merits of this Motion.

## III.    STANDARD OF REVIEW

      Federal Rule of Civil Procedure 15(a) sets out the standard for granting leave to amend a complaint when, as is the case here, a responsive pleading has been served:  "a party may amend the

party's pleading only by leave of court or by written consent of the adverse party." FED. R. CIV. P. 15(a).  The Rule clearly states that "leave shall be freely given when justice so requires." Id. Nonetheless, the policy favoring liberal amendments is not unlimited.  Dole v. Arco Chem. Co., 921 F.2d 484, 487 (3d Cir.  1990).  "The decision whether to grant or to deny a motion for leave to amend rests within the sound discretion of the district court." Pennsylvania Employees Ben. Trust Fund v. Zeneca, Inc., 499 F.3d 239, 252 (3d Cir. 2007).  A district court may deny leave to amend a complaint where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227 (1962)).  The second ground, futility, means that "the complaint, as amended, would fail to state a claim upon which relief could be granted," under the same standard enunciated in Federal Rule of Civil Procedure 12(b)(6).  In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6); see also Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).  In the recent decision of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), the Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. 127 S. Ct. at 1965. Following Twombly, the Third Circuit has cautioned that the factual allegations in the complaint may not be "so undeveloped that it does not provide a defendant the type of notice which is contemplated by Rule 8." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Additionally, "it is no longer sufficient to allege mere elements of a cause of action; instead 'a

complaint must allege facts suggestive of [the proscribed] conduct.'" Id. (alteration in original) (quoting Twombly, 127 S. Ct. at 1969 n. 8). Finally, the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" Id. at 234 (quoting Twombly, 127 S. Ct. at 1965). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Id. (quoting Twombly, 127 S. Ct. at 1965).

Notwithstanding these new dictates from the United Supreme Court and the Third Circuit, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., Civ. A. No. 08-626, 2008 WL 2779079, at *2 (W.D. Pa. Jul. 15, 2008). The general rules of pleading still require only a short and plain statement of the claim showing that the pleader is entitled to relief, not detailed factual allegations. Phillips, 515 F.3d at 231. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir.2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n. 7 (3d Cir. 2002).

**IV.   DISCUSSION**

In its Opposition to Plaintiff's Motion for Leave to File a Second Amended Complaint, Defendant argues that notwithstanding Plaintiff's use of the word "intentional" and his conclusory allegations of intentional discrimination throughout the Amended Complaint, the lone cause of action, in essence, alleges only that SEPTA's "Criminal Record Policy" has a disparate impact on African-Americans. As the disparate impact theory of discrimination is not actionable under section 1981, Defendant claims that Plaintiff should not be permitted to file the proposed Second Amended

7

Complaint and that the Amended Complaint must be dismissed.  Upon consideration of the Second

Amended Complaint under the liberal standards of pleading, the Court disagrees and grants Plaintiff

leave to amend.

As part of the Civil Rights Act of 1866, section 1981 prohibits discrimination in the making

and enforcement of private contracts.[1]  Ladd v. Boeing Co., 463 F. Supp. 2d 516, 524 (E.D. Pa.

2006) (citing 42 U.S.C. § 1981 (1977)).  Interpreting this statute, the United States Supreme Court

has confirmed that 42 U.S.C. § 1981 protects individuals against private employment discrimination

on the basis of race.  Georgia v. Rachel, 384 U.S. 780, 791 (1966).  To establish a *prima facie* case

under section 1981, a plaintiff must show:  (1) he is a member of a protected class; (2) he

satisfactorily performed the duties required by his position; (3) he suffered an adverse employment

action; and (4) either similarly-situated non-members of the protected class were treated more

favorably or the adverse job action occurred under circumstances that give rise to an inference of

discrimination.[2]  Langley v. Merck and Co., Inc., 186 Fed. Appx. 258, 259 (3d Cir. 2006).

It remains well-settled that section 1981 prohibits only "purposeful" or "intentional"

---

[1]  The statute states that:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981(a).

[2]  Because discrimination claims under Title VII, the PHRA, and §§ 1981 and 1983 are all analyzed under the same legal standard, the Court refers to cases considering claims under the other statutes interchangeably with those considering discrimination claims under section 1981. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999);  Showell v. SEPTA, Civ. A. No. 06-1574, 2008 WL 2389459, at *4 (E.D. Pa. Jun. 10, 2008)

discrimination.  Gen. Bldg. Contractors Ass'n v. Pa., 458 U.S. 375, 390-91 (1982); Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 562 (3d Cir. 2002).  Discrimination claims based on disparate impact, however, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.  Proof of discriminatory motive . . .  is not required under a disparate-impact theory."  Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (quoting Teamsters v. U.S., 431 U.S. 324, 335-36 n.15 (1977).  Consequently, disparate impact claims are not cognizable under section 1981.  Gen. Bldg., 458 U.S. at 390; Pryor, 288 F.3d at 562.

Plaintiff does not challenge or take issue with these principles.  Rather, he characterizes the proposed Second Amended Complaint as alleging that Defendant adopted and continued to use its facially neutral Criminal Background policy in an effort to *intentionally* discriminate against African American job applicants.  He explains that "SEPTA enacted these policies not only despite knowing the policy was discriminatory and disproportionately affected those African-American job applicants, but *because* of the policy's adverse affects on African-American job applicants."  (Pl.'s Opp. Mot. to Dismiss Am. Compl. 2.)[3]

Such a cause of action has been explicitly recognized in Pryor v. Nat'l Collegiate Athletic Assoc., 288 F.3d 548 (3d Cir. 2002).  In Pryor, the Third Circuit directly confronted a section 1981 claim challenging defendant NCAA's use of Proposition 16, a facially neutral rule that established scholarship and athletic eligibility criteria for incoming student athletes.  Id. at 552.  The NCAA claimed to have adopted Proposition 16 to improve graduation rates among black student athletes.

---

[3]  Because Defendant's Opposition to the Motion for Leave to File a Second Amended Complaint is virtually identical to its Motion to Dismiss the Amended Complaint, the Court considers the arguments raised by Plaintiff in his Opposition to that Motion to Dismiss when ruling on the current motion.

Id.  Plaintiffs, on the other hand, alleged (1) that Proposition 16 caused increased numbers of black student athletes to lose eligibility for receiving athletic scholarships and participating in intercollegiate athletics during their freshman year, and (2) that the NCAA knew of these effects and intended them to screen out black athletes.  Id.  The district court granted the NCAA's motion to dismiss, finding that "Defendant's awareness or even acceptance of a particular effect does not raise this conduct to the level of purposeful discrimination."  Pryor v. Nat'l Collegiate Athletic Assoc., 153 F. Supp. 2d 710, 716-17 (E.D. Pa. 2001).

On appeal, the Third Circuit agreed that "[t]o prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker (e.g., a state legislature) adopted the policy at issue 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  Id. at 562 (quoting Personnel Admin. of Mass. v. Feeney, 442 U.S. 256, 279 (1979)).  "A mere awareness of the consequences of an otherwise neutral policy will not suffice."  Id.  The court went on to recognize, however, that "'[d]etermining whether invidious discriminatory purpose was a motivating factor [in the adoption of a facially neutral policy] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"  Id. at 563 (quoting Arlington Heights v. Metro Housing Dev. Corp., 429 U.S. 252, 266 (1977)).  Among the factors to be considered in assessing discriminatory purpose are:  (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the sequence of events leading up to the challenged decision; (4) departures from that normal procedural sequence; and (5) the legislative or administrative history, particularly contemporary statements from the decisionmaking body.  Id. (citations omitted).  The court further observed that, due to the fact-intensive nature of this inquiry, "courts have only reluctantly upheld the Rule 12(b)(6) dismissal of a claim alleging unlawful discrimination in the adoption of an otherwise facially neutral policy,"

particularly in light of the fact that Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead simply a "short and plain" statement showing a right to relief.  Id. at 563-64.

Turning to the case before it, the Third Circuit found that the complaint alleged both that (1) the NCAA considered race as one of its reasons for adopting Proposition 16, and (2) the NCAA purposefully discriminated against black student athletes when it adopted Proposition 16 because it knew that the heightened academic requirements would effectively screen out black athletes who would qualify for athletic scholarships.  Id.  "In short," the court noted that "the complaint alleges that the NCAA adopted Proposition 16 because it knew that policy would prevent more black athletes from ever receiving athletic scholarship aid in the first place."  Id.  The Third Circuit then rejected the district court's conclusion that the NCAA adopted Proposition 16 "in spite of" its impact on black athletes, not "because of that impact," reasoning that the distinction between "awareness" and "purpose" is a matter involving state of mind, which is unsuitable for resolution at the motion to dismiss stage.  Id. at 565.  As the complaint had sufficiently alleged adoption of a policy with the intent of discriminating against black athletes, it was sufficient to state a claim for purposeful, disparate treatment on account of race.  Id. at 565.

Following Pryor's lead, several district courts have similarly declined to grant motions to dismiss claims of intentional discrimination based on a facially neutral policy where the complaint raised at least an inference of such intentional discrimination.  In South Camden Citizens in Action v. NJ Dep't. of Envtl. Prot., 254 F. Supp. 2d 486 (D.N.J. 2003), minority residents of a largely minority neighborhood brought suit to challenge air permits granted by defendants for operation of a cement grinding facility.  Id. at 490.  Defendants moved to dismiss plaintiffs' claims of intentional discrimination under section 601 of Title VI, asserting that the allegations of the complaint were "legally deficient because they have merely alleged that Defendants knew or were deliberately

11

indifferent to the disparate impact the siting of the cement grinding facility would have on the residents of Waterfront South." Id. at 496.  Defendants further argued that "an intentionally discriminatory motive [cannot] be reasonably inferred from the complaint because it is incontrovertible that the air pollution criteria that were applied in South Camden to St. Lawrence are uniformly applicable throughout New Jersey and even nationally."  Id. at 497 (internal quotations omitted).

The court disagreed, noting that the plaintiffs alleged facts which, if proven true, would show not simply a disparate impact, but also that defendants were "well-aware of the potential disproportionate and discriminatory burden placed upon that community and failed to take measures to assuage that burden." Id. at 497.  The court remarked that, at that early stage of the case where a record had not yet been developed, "the allegations contained in the Second Amended Complaint suggest that the NJDEP Defendants may have intended invidious discrimination against African-American and Hispanic residents of Waterfront South by granting various permits . . ., and thereby concentrating a disproportionate amount of air pollution in an already environmentally challenged community." Id. at 499.  Dismissing the defendants' arguments, the court declined to consider the ultimate merits of the case, noting that the Federal Rules of Civil Procedure require only a short and plain statement showing a right to relief, not a detailed recitation of proof.  Id. (quoting Pryor, 288 F.3d at 569).  As the court could not say beyond doubt that there was no set of facts alleged in the Second Amended Complaint, which if proven, would entitle plaintiffs to relief, it denied defendants' motion to dismiss the claims of intentional discrimination.  Id.

Similarly, in Almendares v. Palmer, 284 F. Supp. 2d 799 (N.D. Ohio 2003), the plaintiffs alleged that defendants, who were county and state agencies administering the food stamps program,

12

(1) had a policy, practice, or custom of failing to provide bilingual services by sending out materials in English only, and (2) purposefully implemented this practice, knowing of its impact on Spanish-speaking applicants and recipients of food stamps. Id. at 807. To prove defendants' intent, the plaintiffs alleged that defendants agreed to administer the state food stamp program in accordance with the Food Stamp Act and its implementing regulations, which require that notices be sent out in Spanish. Id. Further, plaintiffs asserted that, during settlement of a prior action, county defendants agreed to provide state defendants with Spanish language notices. Id. Because of these prior instances, plaintiffs alleged that "defendants knew of their obligations to provide bilingual services to plaintiffs but continued failing to do so." Id. The court agreed, holding that, "[l]iberally construing the complaint, plaintiffs allege that defendants purposefully discriminated against them when defendants chose to continue a policy of failing to ensure bilingual services and knowing that Spanish-speaking applicants and recipients of food stamps were being harmed as the consequence. If these allegations are true, one could logically infer that the policy was implemented and is being continued 'because of' its impact on national origin." Id. at 808. Accordingly, it denied the motion to dismiss. Id.

In the case at bar, Plaintiff's proposed Second Amended Complaint alleges that, for many years, Defendant has intentionally imposed its "Criminal Record Policy" on applicants for jobs as drivers with both SEPTA and its paratransit subcontracting companies despite knowing that those policies have a disparate impact on African-American citizens. (Sec. Am. Compl. ¶¶ 4.) The Second Amended Complaint goes on to state that Defendant has intentionally selected, instituted, and reaffirmed its "Criminal Record Policy," not only in spite of its knowledge of the disparate impact, but "because of its adverse effects on African-American job applicants." (Id. ¶¶ 5-6.) To

prove Defendant's intent, Plaintiff cites to the case of <u>El v. SEPTA</u>, 418 F. Supp. 2d 659 (E.D. Pa.

2005), wherein another judge from this Court considered the identical "Criminal Record Policy"

under a disparate impact theory of liability and found evidence sufficient to support the existence of

such a disparate impact.  (<u>Id.</u> ¶ 7.)  Finally, the Second Amended Complaint alleges that Defendant

has intentionally imposed these illegal policies without providing for or allowing any inquiry into the

circumstances surrounding the conviction, thereby reinforcing the discriminatory effect of the policy.

(<u>Id.</u> ¶ 9.)

This Court finds that such allegations are sufficient to state a *prima facie* case of intentional

discrimination.  In an effort to diffuse the impact of the proposed Second Amended Complaint,

however, Defendant responds that these factual assertions fail, on several grounds, to show

Plaintiff's entitlement to relief.  Upon full consideration of each of these arguments, the Court finds

that none of them provide a sufficient basis on which to deem the proposed amendment futile at this

early juncture.

<u>First</u>, Defendant contends that Plaintiff's use of the "talismanic words – that SEPTA

intentionally adopted a criminal background policy *because of* its adverse impact on African-

Americans, not *in spite of* the policy's disproportionate effect" is nothing more than a "conclusory

assertion[] of law [that] [is] not a substitute for facts."  (Def.'s Mem. Opp. Mot. for Leave to File

Sec. Am. Compl. 2.)  This argument, while paying lip service to the "liberal rules of federal

pleading," (<u>id.</u> at 4), substantively disregards both Federal Rule of Civil Procedure 8(a)(2), which

requires only "a short and plain statement of the claim showing that the pleader is entitled to relief,"

FED. R. CIV. P. 8(a)(2), and Rule 9(b), which allows intent and other conditions of the mind to be

averred generally.  FED. R. CIV. P. 9(b).  As noted above, the Third Circuit has cautioned against a

premature dismissal of a complaint alleging intentional discrimination through use of a facially neutral policy.  Pryor, 288 F.3d at 563.  Moreover, as the Third Circuit has noted, the distinction between awareness of disparate impact and intent to discriminate is a matter involving state of mind and is, thus, "unsuitable for resolution at the motion to dismiss stage."  Id. at 565.

Like the complaints in Pryor, South Camden, and Almendares, the proposed Second Amended Complaint has sufficiently alleged that SEPTA purposely adopted and enforced a policy with the intent of reducing the number of black applicants for its paratransit driver positions, and that SEPTA knew this policy would adversely affect black applicants.  These assertions are sufficient to state a claim for intentional, disparate treatment on account of race.  Whether the allegations are factually baseless, as Defendant argues, is a matter for summary adjudication after further discovery.

Second, Defendant argues that the El v. SEPTA case, on which Plaintiff relies, actually undermines any showing of intentional discrimination.  As noted above, in El, another judge from this Court considered whether SEPTA's "Criminal Record Policy" had a disparate impact on African-Americans in violation of Title VII.  418 F. Supp. 2d at 665.  The court found that plaintiff, through his expert, adduced sufficient evidence that "minority employees of SEPTA's paratransit providers are disparately impacted by the SEPTA policy in that they are dismissed from employment due to convictions at a rate that is 200 percent greater than non-minorities."  Id. at 668-69.  Although the court deemed Defendant's counter-expert persuasive, it concluded that the weight to be accorded to the experts was a matter for the jury and not amenable to summary judgment.  Id. at 669.  Upon finding that plaintiff set forth a *prima facie* case, however, the Court determined that (1) SEPTA proved its policy to be job related for the position in question and consistent with business necessity, and (2) plaintiff could not show an alternative employment practice that had a less disparate impact

and would also serve the employer's legitimate business interest.  Id. at 670-72.  Ultimately, the court concluded that plaintiff failed to satisfy his summary judgment burden of proof needed to sustain a claim under Title VII.  Id. at 672.  The Third Circuit affirmed this holding.  El v. SEPTA, 479 F.3d 232 (3d Cir. 2007).

Defendant argues that El was mischaracterized in the proposed Second Amended Complaint as supporting SEPTA's knowledge of the disparate impact of its "Criminal Record Policy," when, in fact, the opinion in that case deemed the policy legal.  While the Court agrees that El precludes an inference that SEPTA had knowledge that its policy was "unlawful," we nonetheless find that it supports the inference that Defendant had knowledge of a possible discriminatory impact.  Indeed, notwithstanding the final holding in El, the court explicitly commented on the existence of expert evidence that the "Criminal Record Policy" had a disparate impact on African-Americans.  Id. at 668-69.  Reading the Second Amended Complaint in the light most favorable to Plaintiff, it is logical to infer that Defendant, while believing that the "Criminal Record Policy" was lawful, may have been put on notice of the potential disparate impact caused by the policy, yet deliberately chose to enforce that policy, without change, in an effort to perpetuate that disparate impact.  For purposes of the present motion, the Court must accept that inference as true.

Third, Defendant attempts to distinguish the Third Circuit's decision in Pryor, arguing that it "stands in stark contrast to the paucity of facts in Jackson's proposed Second Amended Complaint." (Def.'s Mem. Opp. Mot. for Leave to File Sec. Am. Compl. 7)  More specifically, Defendant contends that the plaintiffs in Pryor had the benefit of earlier litigation that their counsel had waged against the NCAA over Proposition 16.  (Id.)  The prior lawsuit, which was dismissed for reasons irrelevant to this case, armed the lawyers with evidence amassed from years of litigation and allowed

16

them to file an intentional discrimination lawsuit, attaching substantial amounts of materials from the prior suit.  (Id. at 8.)  In reversing the trial court's decision, the Third Circuit, according to Defendant, focused on this documentary evidence and the specificity of the complaint and its exhibits.  (Id. at 8-9.)  Defendant claims that, in contrast, the proposed Second Amended Complaint contains "*no facts* remotely suggesting that SEPTA took race into account in adopting the criminal background policy."  (Id. at 10.)

Defendant's argument, however, misses the core of the Third Circuit's decision.  Although the complaint in that case was unusually detailed and accompanied by multiple exhibits, the Third Circuit's decision turned solely on whether the complaint contained the requisite "short and plain statement" showing a right to relief, "not a detailed recitation of the proof that will in the end establish such a right."  Pryor, 288 F.3d at 563.  As noted above, the court remarked that questions of intent require findings regarding state of mind, which are "not amenable to summary adjudication."  Id. at 563.  Although the court referenced the exhibits attached to the complaint, it based its ruling on the fact that "*the complaint* alleges that the NCAA purposefully discriminated against black student athletes."  Id. at 564 (emphasis added).  "In short," the court concluded that "*the complaint* alleges that the NCAA adopted Proposition 16 because it knew that policy would prevent more black athletes from ever receiving athletic scholarship aid in the first place."  Id. (emphasis added).  Acknowledging that the intentional discrimination claim could seem "far fetched," the court reaffirmed that it was "reviewing th[e] case at the pleading stage, not the summary judgment stage."  Id. at 566.

While the proposed Second Amended Complaint in the present case certainly does not reach the level of specificity found in the Pryor complaint, it sufficiently alleges that SEPTA had

17

knowledge of the discriminatory effect of its "Criminal Record Policy," yet chose to repeatedly reaffirm these screening standards, without allowing for any individualized inquiry, "because of its adverse effects on African-American job applicants." (Sec. Am. Compl. ¶¶ 4-9.) It further cites to the El case as support for Defendant's knowledge of previously produced expert evidence demonstrating the disparate impact of the "Criminal Record Policy." (Id. ¶ 7.) Notwithstanding the relative paucity of other facts in the proposed Second Amended Complaint to support a finding of intentional discrimination, a denial of leave to amend on grounds of futility is not the appropriate time to make any such speculative findings of fact regarding intent. Rather, it suffices for this Court to note that the Second Amended Complaint appropriately alleges all the elements of a section 1981 violation.

Finally, Defendant cites to the case of Pollard v. Wawa, 366 F. Supp. 2d 247 (E.D. Pa. 2005), to argue that Plaintiff's proposed Second Amended Complaint is nothing more than an improper attempt to "repackage" a disparate impact claim as an intentional discrimination claim. In Pollard, the plaintiff filed a class action against defendant Wawa Food Market alleging that defendant applied an unlawful criminal conviction policy in its employment decisions. Id. at 249-50. Defendant moved to dismiss the section 1981 claim on the ground that it did not allege intentional discrimination. Id. at 253. In response, plaintiff pointed to a single paragraph of her complaint, which stated, "[u]pon information and belief, Defendant intentionally designed, utilized, and perpetuated a system of racial discrimination by and through its criminal conviction policy." Id. At the request of the court, Plaintiff submitted a letter clarifying this paragraph and explaining that in the event that defendant recklessly continued to enforce its discriminatory policy, "a jury may properly determine such conduct to be 'intentional' as required for section 1981 liability." Id. The

court rejected plaintiff's argument and dismissed the section 1981 claim, reasoning as follows:

> [S]tarting from the questionable premise that criminal conviction policies such as Wawa's categorically violate Title VII due to their disparate impact, plaintiff believes that defendants' "recklessness in continuing to enforce a patently illegal policy may properly be found to satisfy section 1981's 'intentional' standard." . . . Even accepting the premise of plaintiff's argument, the law is clear that nothing short of "purposeful discrimination" is actionable under § 1981. . . . Indeed, plaintiff's theory runs directly contrary to the settled understanding of intentional discrimination that discrimination is intentional only if the defendant "selected or reaffirmed a particular course of action 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." . . . Plaintiff, despite employing the word "intentional" in her complaint, is therefore clearly advancing a disparate impact theory of discrimination. Such a theory is not actionable under section 1981.

Id. at 253 (internal citations omitted).

Defendant, in this case, now argues that Plaintiff's proposed Second Amended Complaint suffers from "the same infirmities" as the complaint in Pollard. The Court, however, finds significant distinctions between the complaint at issue and the one considered in Pollard. The plaintiff in Pollard presented solely a disparate impact claim and only once mentioned the word "intentional" in the complaint.[4] Thereafter, when asked by the court to clarify the meaning of that single paragraph, the plaintiff still did not allege that the defendant selected or affirmed its policy because of its adverse effects; rather she argued that if a jury found that the policy effected a disparate impact, then it could equally find that defendant's continued enforcement of it was intentional. By contrast, in this case, Plaintiff explicitly puts forth a claim of intentional

---

[4] In support of its Motion to Dismiss the Amended Complaint, Defendant argued that the mere fact that Plaintiff used the word "intentional" in nine paragraphs, while the plaintiff in Pollard used the word only one time, did not provide grounds for distinction. It claimed that "[m]ere repetition does not create a claim." (Def.'s Reply Br. 7.) What Defendant fails to recognize, however, is that the plaintiff in Pollard claimed only that the defendant recklessly enforced its policy in spite of its disparate impact, whereas Plaintiff in this case has expressly argued that Defendant has enforced its policy because of its disparate impact.

discrimination, argues that Defendant knew of the disparate impact due to prior litigation, and contends that Defendant chose to reaffirm its use of this policy, without deviation, in order to intentionally discriminate against African-Americans.  In other words, the allegations of Plaintiff's proposed Second Amended Complaint go beyond a bare assertion of mere awareness of disparate impact by Defendant; they contend that Defendant intended to achieve the disparate impact through its facially neutral policy.

In short, the allegations in the proposed Second Amended Complaint offer a short and plain statement showing a violation of section 1981, enforceable under section 1983, in conformity with Federal Rule of Civil Procedure 8.  Further, as permitted by Federal Rule of Civil Procedure 9(b), Plaintiff has pled intent generally, with admittedly scant reference to particular circumstances. Although Plaintiff will be required to bolster his allegations with evidence as the litigation progresses, at this juncture, it does not appear, beyond a reasonable doubt, that Plaintiff would not be entitled to relief under any reasonable reading of the proposed Second Amended Complaint. Accordingly, the Court grants Plaintiff leave to amend.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTHONY JACKSON,                          :
Individually and on behalf of All Others  :
Similarly Situated,                       :                CIVIL ACTION
                                          :
                 Plaintiffs,              :
                                          :
       v.                                 :
                                          :
SOUTHEASTERN PENNSYLVANIA                  :                NO.  08-4572
TRANSPORTATION AUTHORITY                   :
                                          :
                 Defendant.               :

## ORDER

_____AND NOW, this *10th* day of *March*, 2009, upon consideration of Plaintiff Anthony Jackson's

Motion for Leave to File a Second Amended Complaint (Doc. No. 24) and the Response thereto of

Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") (Doc. No. 25), it is hereby

**ORDERED** that Plaintiff's Motion is **GRANTED** and the Second Amended Complaint, attached as

Exhibit A to Plaintiff's Motion, shall be filed by the Clerk of Court as a separate docket entry.

It is further **ORDERED**  that Defendant SEPTA's Motions to Dismiss the Amended Complaint

(Doc. No. 18) and for Leave to File a Reply Brief (Doc. No. 22) are **DENIED AS MOOT** in light of

Plaintiff's filing of the Second Amended Complaint.

It is so **ORDERED**.

BY THE COURT:

*s/ Ronald L. Buckwalter*_____
RONALD L. BUCKWALTER, S.J.

21