IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANTHONY JACKSON,                    :
Individually and on behalf of All Others   :
Similarly Situated,                 :          CIVIL ACTION
                                    :
            Plaintiffs,             :
                                    :
      v.                            :
                                    :
SOUTHEASTERN PENNSYLVANIA            :          NO.  08-4572
TRANSPORTATION AUTHORITY             :
                                    :
            Defendant.              :

MEMORANDUM

BUCKWALTER, S. J.                                          August 31, 2009

Currently pending before the Court is a Motion by Plaintiff Anthony Jackson for Class

Action Certification and the Response of Defendant Southeastern Pennsylvania Transportation

Authority ("SEPTA").  For the following reasons, the Motion is denied.

I.      FACTUAL AND PROCEDURAL BACKGROUND

        A.      Procedural History

        On October 3, 2007, Erskin Butler, Herbert Page, and Stephen Holloway filed a class

action complaint against SEPTA, Alevistar Group LLC, Triage, Inc., and Anderson Travel, Inc.

alleging five counts, disparate impact racial discrimination under Title VII.  (Compl., Butler v.

SEPTA, Civ. A. No. 07-4161 (Oct. 3, 2007) (the "Butler case").)  By way of Order issued March

17, 2008, this Court dismissed four of the counts, leaving only the Title VII claim.

        On September 19, 2008, Plaintiff Jackson filed a class action complaint against only

SEPTA challenging, under 42 U.S.C. § 1981, the disparate impact of its criminal record policy. (Compl., Jackson v. SEPTA, 08-4572 (Sep. 19, 2008) (the "Jackson case").)  On November 12, 2008, this Court ordered that the Butler and Jackson cases be consolidated for purposes of discovery and trial.  SEPTA then moved, on November 19, 2008, to dismiss on the ground that the disparate impact theory of discrimination is not available under 42 U.S.C. § 1981.  In response, Plaintiff filed an Amended Complaint, dated December 15, 2008, including a single count, under 42 U.S.C. § 1981, alleging intentional discrimination by SEPTA against African-Americans.  In the meantime, Plaintiff sought reconsideration of the consolidation order and, on December 17, 2008, the Court ordered that the cases no longer be consolidated.

On December 31, 2008, Defendant moved to dismiss the Amended Complaint, asserting that Plaintiff had failed to properly plead a cause of action for intentional discrimination. Plaintiff responded on January 14, 2009, and Defendant filed a reply brief on January 26, 2009. Before this Court had the opportunity to rule on the motion, the Third Circuit handed down its decision in McGovern v. City of Phila., 554 F.3d 114 (3d Cir. 2009), holding that "the express cause of action for damages created by section 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." Id. at 121 (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)).  By way of supplemental letter, Defendant requested that the Court dismiss Plaintiff's Amended Complaint on the basis of the McGovern decision.

Apparently acknowledging the import of McGovern, Plaintiff submitted a Motion for Leave to File a Second Amended Complaint on February 20, 2009.  Upon consideration of both the motion and the response, the Court, via Memorandum and Order dated March 10, 2009,

deemed Plaintiff's cause of action viable and granted Plaintiff leave to file the Second Amended

Complaint.  On March 25, 2009, Defendant filed its Answer and Affirmative Defenses.

The sole count in the Second Amended Complaint asserts a violation of 42 U.S.C. §

1981, which Plaintiff seeks to enforce pursuant to 42 U.S.C. § 1983.  The crux of Plaintiff's

claim challenges Defendant's "Criminal Record Policy," which purportedly prohibits SEPTA,

and all of its paratransit service providers, from hiring any person with a criminal record,

including felony or misdemeanor convictions, without allowing any inquiry into the

circumstances of the conviction.  (Sec. Am. Compl. ¶ 29.)  Plaintiff alleges that, for many years,

Defendant SEPTA:

> intentionally imposed [these] screening standards and practices on applicants for
> jobs as drivers with SEPTA and its paratransit subcontracting companies . . . that
> have had a disparate impact on African American job applicants and employees
> with older criminal offenses that have no bearing on the ability of the individual in
> question to safely and appropriately carry out the responsibilities of a SEPTA bus
> driver or a paratransit driver.

(Id. ¶ 4.)  The resulting disparate impact from this policy was purportedly "brought to light" by a

prior judicial ruling challenging the identical policy.  (Id. ¶ 7 (citing Douglas El v. SEPTA, 418

F. Supp. 2d 659 (E.D. Pa. 2005)).)  Nonetheless, over the years SEPTA has "intentionally

selected, instituted and reaffirmed" this "Criminal Record Policy" precisely because of its

adverse effects on African-Americans.  (Id. ¶ 7.)  In essence, the claim asserts that Defendant

violated the provisions of section 1981 by instituting and maintaining this criminal record policy

with respect to both their hiring of bus operators and their subcontractors' hiring of paratransit

drivers.  (Id. ¶¶ 56-57.)

Plaintiff filed the current Motion for Class Certification on June 8, 2009, seeking

certification of the following class of individuals:

> All people who have been terminated or have been denied employment between July 1, 2003 and the present, as a driver for SEPTA and/or any company that has provided paratransit services for Defendant SEPTA as a result of a past felony or misdemeanor conviction that has no direct relevance to that individual's competence as a bus driver or paratransit driver.

(Pl.'s Mot. Summ. J. 1.)  Defendant responded on June 25, 2009.

### B.   Class Action Allegations[1]

#### 1.   Requirements for Bus Operator Positions with SEPTA

The evidence reveals that, during the time period relevant to Plaintiff Jackson's claims, SEPTA employed a singular procedure for the hiring of bus drivers.  Applicants for employment with SEPTA could apply generally for any future vacancies in the organization, or could apply for a specific bus driver position that had been advertised.  (Def.'s Resp. Mot. Class Cert., Ex. B, Decl. of Sue Flower ("Flower Decl."), ¶¶ 4-5, June 24, 2009.)  Applicants could register on-line at SEPTA's career opportunities website.  (Id. ¶ 6.)  In order to register, an applicant had to provide contact information, a social security number, driver's license, career preference, education, and employment history.  (Id. ¶ 7.)  Additionally, the on-line registration asked applicants to answer the following questions:  (1) "Have you ever been convicted of a criminal

---

[1]  In his Memorandum in Support of his Motion for Class Certification, Plaintiff gives an expanded and more detailed version of the facts of his case without reference or citation to either the Second Amended Complaint or evidence.  To the extent this recitation goes beyond the allegations of the Complaint without citation to evidence, the Court cannot accept it as true.

Defendant's responsive pleading contains a similarly detailed factual recitation.  To the extent it references various affidavits with attached exhibits and to the extent such facts are unrebutted by Plaintiff, the Court accepts them as true.  See In re Hydrogen Peroxide, 552 F.3d 305, 309 (3d Cir. 2008) ("[i]n deciding whether to certify a class under [Rule] 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties," including expert testimony.").

offense?"; and (2) "If yes, indicate type of offense, penalty and date."  (Id. ¶ 8.)  Upon

completion of this process, an applicant could post on-line for job opportunities.  (Id. ¶ 9.)

      In order to qualify for a bus driver position with SEPTA, an applicant had to possess a

valid driver's license for three to five years, with preference given to those with Class A or Class

B commercial driver's licenses.  (Id. ¶ 10.)  Such qualified individuals were then scheduled for

the bus operator assessment.  (Id. ¶¶ 11-12.)  If an individual received passing marks, SEPTA

would conduct a motor vehicle record check and a criminal history record check.  (Id. ¶ 12.)

      SEPTA's criminal record policy, in effect at the time pertinent to Plaintiff's claims,

contained the following relevant provisions:

> Conviction records or information about convictions may be considered by the
> Authority when:
> a.
> > (1)     The conviction[] is for murder, felony, misdemeanor of any degree
> > and
> > (2)     The conviction relates to the applicant's suitability for employment
> > in the position for which he/she has applied.
>
> b.     In the event that the Authority decides not to hire the applicant based in
> whole or in part on the applicant's criminal history record information,
> which he/she accurately disclosed [i]n his/her employment application,
> then the Authority shall notify the applicant in writing, setting forth the
> basis for the rejection.
>
>     * * *
>
> d     It shall be the responsibility of the Senior Director, Human Resources or
> his/her designee, in consultation with SEPTA's Legal Department and the
> Deputy General Manager, when necessary, to decide whether or not a
> specific job applicant with a criminal conviction may be hired.  In all
> instances when an applicant with a criminal record is being considered for
> a position within Operations, the Chief of Operations must also approve
> the applicant in writing.  In the event an applicant is not hired because of a
> criminal record, the Senior Director, Human Resources shall advise the
> applicant in writing of the basis for the decision not to hire.

* * *

1.  Any job applicant or employee with a criminal record who does not disclose all convictions of any criminal offense, as those terms are defined in this Policy/Instruction, on the job application form, shall be interviewed for possible falsification of employment application. . . .

2.  The purpose of the interview is to determine the nature of the criminal offense committed, when it was committed, when the conviction occurred, the number of convictions, whether the application for employment form failed to accurately disclose the conviction of a criminal offense, and whether the employee willfully and knowingly concealed a criminal conviction by failing to list a conviction or convictions on the job application form.

3.  If it is determined that the employee has a conviction that would have precluded him/her from employment had this information been accurately disclosed on the employment application form, the employee shall be discharged for falsification of employment application and/or for a criminal record.

4.  If the employee has a conviction record which would not have precluded him/her from employment had it been disclosed on the employment application form, the focus of the inquiry shall be whether the employee willfully and knowingly concealed this information.  In the event that [various senior managers] . . . determine[] that the employee willfully and knowingly concealed his/her conviction record, the employee shall be discharged for falsification of employment application.

(Id. ¶ 13, Ex. 1.)  The policy went on to chart examples for the types of criminal offense convictions that may preclude an applicant from employment in certain job classifications.  (Id.)  For all positions requiring operation of any vehicle, SEPTA looked closely at convictions for operation of motor vehicles while under the influence of alcohol and/or drugs, as well as other controlled substance offenses.  (Id.)

## 2.    <u>Requirements for SEPTA's Paratransit Driver Positions</u>

SEPTA does not directly hire drivers to perform its paratransit work,[2] but rather subcontracts it out to individual paratransit companies.  With respect to the individuals employed as paratransit drivers, SEPTA has imposed upon its subcontractors a stricter prohibition on the hiring of drivers with criminal records.  By way of example, on August 25, 2004, SEPTA entered into a four-year contract with First Transit, a nationwide passenger transportation services company, to provide paratransit service in Montgomery County Pennsylvania.  (Def.'s Resp. Mot. Class Cert., Ex. C., Decl. of Frank Brandis ("Brandis Decl."), ¶ 3 (June 24, 2009).)  The contract explicitly provided that:

> Contractor shall not employ in any SEPTA-related work under this Contract any person who has a current or past record of any conviction at any time for driving under the influence of alcohol (DUI) vehicular homicide, possession of any drug with the intent to deliver, or for a felony of any kind.  In addition, Contractor shall not employ in any SEPTA-related work under this Contract any person who has had any convictions at any time for sexually related offense of any grade whatsoever or for any convictions, whether felony or misdemeanor, that concerns forgery, falsification of records, or false swearing to authorities.

> * * *

> In addition to the above, Contractor shall not employ in any SEPTA-related work under this Contract any person who has had a conviction within the past seven (7) years of any misdemeanor not otherwise included with the above paragraph, nor shall Contractor employ any person who is currently on probation or parole for any offense.

> * * *

> If an employee accidentally or intentionally fails to disclose required information, SEPTA reserves the right to permanently bar the person from work under this Contract.

---

[2]  SEPTA is required by law to operate a paratransit system which provides rides to disabled patrons.  <u>Pokalsky v. SEPTA</u>, Civ. A. No. 02-323, 2002 WL 1998175, at *1 (E.D. Pa. Aug. 28, 2002).

(Id. ¶ 3, Ex. 1.)

In bidding for this contract, however, First Transit provided a proposal with a "System

Management Plan," which, in part, set forth the following, more stringent requirements for its

paratransit drivers:

- A motor vehicle record exhibiting no more than one moving violation in the past 24 months and no more than one suspension.
- No felony convictions.
- No record of drug or alcohol offenses.
- No misdemeanor criminal record for the past seven years.
- No record of DUI or DWI.
- Not subject to outstanding warrants for arrests.

(Brandis Decl. ¶ 6, Ex. 4.)  These requirements were established solely by First Transit and not

by SEPTA.

Subsequently, on January 5, 2006, SEPTA entered into another four-year contract with

First Transit, this time to provide paratransit services in Bucks County, Pennsylvania.  (Brandis

Decl. ¶ 5, Ex. 2.)  Unlike the previous contract, this contract indicated that First Transit could

"not employ as a driver in SEPTA-related work any person who indicates on the application form

that he or she has a current record of any conviction at any time for DUI or for any felony or

misdemeanor," that was listed in a separate attachment.  (Id.)  Specifically, conviction of the

following offenses constituted an automatic disqualification for the position of paratransit driver:

aggravated assault, aggravated indecent assault, causing/aiding suicide, causing/risking

catastrophe, concealment of a child, crimes involving weapons of mass destruction, criminal

coercion, dealing infant child, DUI, endangering child, ethnic intimidation, false imprisonment,

false report to law enforcement, false swearing, harassment and stalking, interference with

custody of children, intimidation of witness or victim, involuntary deviate sexual intercourse,

kidnapping, luring a child, manslaughter voluntary, manslaughter involuntary, murder, neglect of care dependent person, perjury, physical offenses in prison, physical offenses to unborn children, rape, robbery, sexual abuse of children, statutory sexual assault, tampering with evidence/public records, terroristic threats, unlawful restraint, unsworn falsifications to authorities, and vehicular homicide.  (Id.)  Further, the contract set forth a list of other crimes for which a conviction within seven years of the application was disqualifying.  (Id.)  First Transit's System Management Plan included the same, previously-established hiring requirements.  (Id.)

Ultimately, SEPTA executed contracts for paratransit services with six separate companies, including First Transit, Edens-RTS, Triage, Inc., Community Transport of Delaware County, MV Contract Transportation, and Krapf's Coaches, Inc.[3]  (Brandis Decl. ¶ 7.)

**C.      Facts Underlying Named Plaintiff's Case**

According to the facts alleged in the Second Amended Complaint, Plaintiff Anthony Jackson, at the time relevant to this litigation, was a forty-four year old African-American male with a five-year employment history driving vans, trucks, and paratransit vehicles.  (Sec. Am. Compl. ¶ 20.)  Jackson had a criminal history consisting of:  (1) several misdemeanor convictions, stemming from a November 1993 incident, including indecent assault, indecent exposure, recklessly endangering another, open lewdness, simple assault, false imprisonment, and unlawful restraint – all for which he received three years probation; (2) an arrest for an incident occurring in 2000, for which the charges were dismissed; and (3) an arrest for an incident occurring in 2001, for which the charges were *nolle prossed*.  (Id.; Flower Decl. ¶ 20, Ex. 6.)

---

[3]  The parties have not provided the Court with copies of these other contracts.

In 2002, Plaintiff first applied for a position as a bus driver with SEPTA.  (Sec. Am. Compl. ¶ 21.)  Although he passed all required testing, he was denied employment based solely on his past criminal history.  (Id.)  Subsequently, in early 2003, Plaintiff accepted employment with Triage, Inc. ("Triage"), a paratransit provider who contracts with SEPTA.  (Id. ¶¶ 9, 22.)

On March 21, 2005, Plaintiff submitted an application for employment with SEPTA as a bus driver, but applied only generally for "future vacancies."  (Flower Decl. ¶ 15, Ex. 3.)  In that application, he denied ever being convicted of a crime.  (Id.)  Nine days later, he submitted an application for a specific bus operator position, which again denied conviction of any crime, was disregarded by SEPTA due to the absence of any work history.  (Flower Decl. ¶16, Ex. 4.)  Plaintiff remained employed with Triage until 2005, when he was laid off due to the company's financial difficulties.  (Sec. Am. Compl. ¶ 22.)

Plaintiff began working as a paratransit driver for SEPTA subcontractor First Transit in August 2005.  (Id. ¶ 34.)  As part of his employment application, Plaintiff revealed the full extent of his criminal history.  (Id. ¶ 35.)  Despite his background, Plaintiff was hired and worked for First Transit without incident until 2006, when a SEPTA supervisor informed him of a change in SEPTA's policy that barred persons with criminal convictions from employment.  (Id. ¶ 36.)  The supervisor, however, told Plaintiff that, under a "grandfather clause" and because he was an active employee in good standing, he would not be terminated.  (Id.)

On March 13, 2006, during his employment with First Transit, Plaintiff submitted a third application for a bus driver position with SEPTA.  (Flower Decl. ¶ 17, Ex. 5.)  This application

disclosed both his work history and the fact that he had been convicted of a criminal offense.[4]
SEPTA called him in for testing and, in May 2006, Plaintiff took and passed the bus operator
assessment.  (Id. ¶¶ 17-18.)  SEPTA then sought motor vehicle and criminal history background
checks on Plaintiff.  (Id. ¶ 19.)  Upon review of Plaintiff's criminal history and full application,
SEPTA disqualified Plaintiff from consideration, notifying him on September 7, 2006.  (Id. ¶
21.)

> Due to some confusion on SEPTA's website, as a result of Plaintiff entering different
user names for each application, Plaintiff was placed back into the candidate pool for bus
operator positions and rescheduled for testing in 2007.  (Id. ¶¶ 22-23.)  He passed the assessment
again, and SEPTA re-requested his motor vehicle and criminal history records.  (Id. ¶ 24.)  Upon
discovering the duplicate testing and record checks, Plaintiff was removed from the candidate
pool.  (Id. ¶ 25.)

> Thereafter, on December 13, 2007, Plaintiff received a call from his supervisor at First
Transit, informing him that due to a change in SEPTA's employment policy, he was being
terminated, at SEPTA's directive, solely because of his prior criminal record.  (Id. ¶ 38.)  Since
that date, Plaintiff has remained unemployed.  (Id. ¶ 41.)

## II.    STANDARD OF REVIEW

> To obtain certification, a class must satisfy the requirements of Federal Rule of Civil
Procedure 23(a) and 23(b).  Rule 23(a) sets forth four prerequisites to class certification:

> (1) the class is so numerous that joinder is impracticable;

---

[4]  Specifically, when asked to explain his conviction, he stated, "[i]t was a mistermeaner
and they gave me probation."  (Id.)

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  Once a threshold showing is made of these four prerequisites – often referred to as numerosity, commonality, typicality, and adequacy of representation – the court must examine whether the class falls within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b).  In re Cmty. Bank of N. Va., 418 F.3d 277, 302 (3d Cir. 2005).  In this case, Plaintiff moves for class certification on behalf of the class under both Rule 23(b)(2) and (b)(3), which provide for certification when:

(b)(2) [T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

FED. R. CIV. P. 23(b).

The proponent of certification bears the burden of proving the prerequisites of a class action under Rule 23(a), as well as showing that the class fits within one of the Rule 23(b) categories.  Chiang v. Veneman, 385 F.3d 256, 264 (3d Cir. 2004).  Although the plaintiff need not establish the merits of his case at this stage, id. at 262, the Third Circuit has recently held that "[a]n overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 316 (3d Cir. 2008).

12

Because certification questions are often intertwined with a case's factual and legal issues, "[i]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  Id. (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982)); see also Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006).  In other words, "[i]n deciding whether to certify a class under [Rule] 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties," including expert testimony.  Hydrogen Peroxide, 552 F.3d at 307 (citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, 259 F.3d 154, 166, 167 (3d Cir. 2001)).  The court is not confined to the allegations of the complaint.  Hydrogen Peroxide, 552 F.3d at 317 n.18. Ultimately, "[b]ecause the decision whether to certify a class 'requires a thorough examination of the factual and legal allegations,' . . . the court's rigorous analysis may include a 'preliminary inquiry into the merits, . . . and the court may consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.'"  Id. (quoting 5 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 23.46[4]).  "'The interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing class certification.'"  Buzzarro v. Ocean County, Civ. A. No. 07-5665, 2009 WL 1617887, at *10 (D.N.J. June 9, 2009) (quoting Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985).

    Since class certification requires a finding that each of the requirements of Rule 23 has been met, "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence."  Hydrogen Peroxide, 552 F.3d at 320.  "In other words, to certify a class the district court must find that the evidence more likely than not establishes each

13

fact necessary to meet the requirements of Rule 23." Id.  "A party's assurance to the court that it intends or plans to meet the requirements is insufficient." Id. at 317.  "If a class is certified, 'the text of the order or an incorporated opinion must include:  (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified; and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis.'" Id. at 320-21 (quoting Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 187 (3d Cir. 2006)).

## III.    DISCUSSION

### A.    General Arguments Against Class Certification

As noted above, Plaintiff alleges intentional discrimination in violation of section 1981 and seeks to certify the following class:

> All people who have been terminated or have been denied employment between July 1, 2003 and the present, as a driver for SEPTA and/or any company that has provided paratransit services for Defendant SEPTA as a result of a past felony or misdemeanor conviction that has no direct relevance to that individual's competence as a bus driver or paratransit driver.

(Pl.'s Mot. Class Cert. 1.)  In response to Plaintiff's Motion for Class Certification, Defendant first sets forth several arguments, outside the confines of Rule 23, as to why the class should not be certified.  Specifically, Defendant contends that:  (1) the class definition is impermissibly vague and overbroad; (2) Plaintiff has failed to provide any evidence that SEPTA intentionally instituted a policy that had a discriminatory impact on African-Americans; and (3) certification must be denied because of the considerable potential for unwarranted settlement pressure.  The Court addresses each assertion individually.

### 1.     <u>Whether Plaintiff's Class Definition is Vague and Overbroad</u>

Defendant's original argument focuses on the class definition itself.  Several courts have considered the sufficiency of the class definition itself before embarking on a Rule 23 analysis. <u>See</u>, <u>e.g.</u>, <u>McDonough v. Toys R Us</u>, ___ F. Supp. 2d ___, 2009 WL 2055168, at *8-9 (E.D. Pa. Jul. 15, 2009); <u>Kline v. Sec. Guards, Inc.</u>, 196 F.R.D. 261, 267-68 (E.D. Pa. 2000); <u>Black v. Premier Co.</u>, No. Civ. A. 01-4317, 2002 WL 32122658, at *5 (E.D. Pa. Sept.13, 2002).  By contrast, other courts have eschewed such an analysis in favor of a strict consideration of the Rule 23(a) factors.  <u>See</u> <u>Chakejian v. Equifax Info. Servs.</u>, 256 F.R.D. 492, 497 (E.D. Pa. 2009) (considering the viability of the class definition in the context of the Rule 23(a) numerosity analysis); <u>Blain v. Smithkline Beecham Corp.</u>, 240 F.R.D. 179, 184 (E.D. Pa. 2007) (finding that the inquiry as to the adequacy of the class definition is subsumed in the Rule 23(a) analysis).

When weighing the merit of both approaches, this Court notes that the test of Rule 23(a) is "silent on the matter" of whether a class definition is proper.  5 James W. Moore et al, Moore's Federal Practice § 23.21[1], at 23-44 (3d ed. 2008).  In this case, Defendant has put forth two very specific challenges to the proposed class definition that are not subsumed by any of the Rule 23(a) factors.  More precisely, it claims that the class definition is:  (1) vague, as Plaintiff has failed to define a readily ascertainable class; and (2) overbroad, as Plaintiff has impermissibly extended the liability period.  In the interests of ensuring that the putative class is legally viable, the Court engages in a preliminary analysis of the class definition.

### a.     <u>Vagueness</u>

Defendant's first challenge claims that the class definition is too vague to delineate the precise class members to be included.  The Manual for Complex Litigation (Third) "instructs that

15

it is 'necessary to arrive at a definition that is precise, objective, and presently ascertainable.'" In re Linerboard Antitrust Litig., 2-3 F.R.D. 197, 221 (E.D. Pa. 2001) (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.14 (3d ed. 1995)); see also Wachtel, 453 F.3d at 187.  Where a proposed class requires the court to address "the central issue of liability" in the case, the class definition may be untenable.  Mueller v. CBS, Inc., 200 F.R.D. 227, 233 (W.D. Pa. 2001); Sanneman v. DaimlerChrysler Corp., 191 F.R.D. 441, 445 (E.D. Pa. 2000); Forman v. Data Transfer, Inc., 164 F.R.D. 400, 403 (E.D. Pa. 1995).  "Definitions . . . should avoid criteria that are subjective (e.g., a plaintiff's state of mind) or that depend on the merits (e.g., persons who were discriminated against)."  Linerboard, 203 F.R.D. at 221 (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.14).

     Plaintiff's proposed class definition suffers from this precise defect by defining the class, in part, as "[a]ll people who have been terminated or have been denied employment . . . as a driver for SEPTA and/or any company that has provided paratransit services for Defendant SEPTA *as a result of a past felony or misdemeanor conviction that has no direct relevance to that individual's competence as a bus driver or paratransit driver.*"  (Pl.'s Mot. Class Cert. 1 (emphasis added).)  Under this definition, the Court would be required to conduct separate, individualized hearings for each potential class member on the central issue of litigation, *i.e.* whether each class member's criminal conviction has valid and compelling relevance to the position for which he or she was either not hired or terminated.  Such a class description falls far from the "precise, objective and presently ascertainable" definition demanded by Rule 23(a) and requires the parties to litigate the merits of the case prior to even determining the parameters of the class.  Indeed, by permitting its certification, "[m]any of the streamlining benefits that are the

16

hallmark of a proper class action would be lost in the morass of individualized determinations of class membership." Kline, 196 F.R.D. at 268.

Notably, however, the mere existence of a problematic class definition does not automatically mandate denial of class certification. Rather, the court may, if possible, limit or alter the definition to remedy the problem. Finberg v. Sullivan, 634 F.2d 50, 64 n.9 (3d Cir. 1980) (where a potential issue with class certification can be resolved by redefining the classes, the district court "should not deny certification on account of such problems without considering the possibility of redefining the classes."); Bacal v. SEPTA, Civ. A. No. 94-6497, 1995 WL 299029, at *7 (E.D. Pa. May 16, 1995) (reconstructing a problematic class definition). Thus, instead of perfunctorily deeming the class uncertifiable, this Court seeks to redefine it in such a way as to eliminate the defect. To do so, the Court restructures the definition to include "all people, who have been terminated or have been denied employment as a driver for SEPTA and/or any company that has provided paratransit services for Defendant SEPTA, as a result of a past felony or misdemeanor conviction." Broadening the class, in this regard, will allow Defendant to prove generally that some, if not all, classes of convictions listed in its policies have a direct bearing on an individual's ability to be a paratransit operator, without having to delve into the individual merits of each case.

### b.    Overbreadth

Defendant's second challenge to the class definition contends that it impermissibly extends the liability period to include individuals as to whom the statute of limitations has already run. "As a general rule, a class may only include those members whose claims are not barred by the applicable statute of limitations." Lanning v. SEPTA, 176 F.R.D. 132, 148 (E.D.

Pa. 1997).  To permit such untimely plaintiffs to join the suit "would mutate the class action into a vehicle for revitalizing stale claims."  <u>Vinson v. Seven Seventeen HB Phila. Corp.</u>, Civ. A. No. 00-6334, 2001 WL 1774073, at *10 (E.D. Pa. Oct. 31, 2001).

Plaintiff's sole cause of action alleges discrimination under 42 U.S.C. § 1983.  Because 42 U.S.C. § 1983 does not contain a statute of limitations, courts look to 42 U.S.C. § 1988, which requires use of the statute of limitations for the state where the federal court sits, unless its application would conflict with the Constitution or with federal law.  <u>Lake v. Arnold</u>, 232 F.3d 360, 368 (3d Cir. 2000).  The Third Circuit has repeatedly held that a state's statute of limitations for personal injury actions applies to all actions brought under 42 U.S.C. § 1983.  <u>Padilla v. Twp. of Cherry Hill</u>, 110 Fed. Appx. 272, 276 (3d Cir. 2004); <u>Montgomery v. DeSimone</u>, 159 F.3d 120, 126 n.4 (3d Cir. 1998).  As Pennsylvania sets forth a two-year limitations period for personal injury actions, 42 Pa.C.S. § 5524 (2004), that same two-year period is applicable to Plaintiff's section 1983 claims.

As noted above, Plaintiff filed his class action Complaint on September 19, 2008.  Thus, for a putative class member to fall within the applicable limitations period, he or she must have suffered discrimination by SEPTA or its paratransit providers on or after September 19, 2006.  The class definition provided by Plaintiff, however, extends the liability period to include all people who have been terminated or denied employment between July 1, 2003 and the present.  Such piggybacking of plaintiffs whose claims would be untimely if brought individually is simply impermissible.

Moreover, although not raised by Defendant, the Court notes another, and perhaps more

18

problematic overbreadth issue.  Plaintiff includes in his class "[a]ll people" terminated or denied employment as a driver for SEPTA or its paratransit companies due to a criminal history.  The gist of Plaintiff's legal action, however, is that SEPTA's practice of denying and/or terminating employment based on its criminal record policy was intentionally implemented to perpetuate the policy's disparate impact against African Americans.  Inclusion of other racial groups within the class definition would introduce individuals who could have no possible claim under Plaintiff's sole theory of liability and whose presence would, in fact, undermine the viability of Plaintiff's cause of action.

Nonetheless, the Court again recognizes its ability to tailor the class definition to make it workable.  Given this authority, and in light of the previous alteration set forth above, the Court now formulates the following class definition:

> All African-Americans who have been terminated or have been denied employment between September 19, 2006 and the present, as a driver for SEPTA and/or any company that has provided paratransit services for Defendant SEPTA as a result of a past felony or misdemeanor conviction.

The Court proceeds through the remainder of the analysis under this new definition.

### 2.   Whether Plaintiff's Failure to Provide Any Evidence that SEPTA Intentionally Instituted a Policy that Had a Discriminatory Impact on African-Americans is Fatal to Class Certification

Defendant's second general argument against class certification asserts that Plaintiff has failed to produce any evidentiary support for, or even a suggestion of how he intends to prove his theory that SEPTA instituted its criminal record policies with the intent of discriminating against African-Americans.   Defendant cites to the Third Circuit's statement in Hydrogen Peroxide that

19

"the question at class certification stage is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class.  When the latter issue is genuinely disputed, the district court must resolve it after considering all relevant evidence."  552 F.3d at 325.  Defendant goes on to argue that Plaintiff "has failed to produce a shred of evidence that African-Americans are disproportionately under-represented in either job classification . . . that there was any causal relationship between any SEPTA policy and any such under-representation, that SEPTA had any knowledge that its policies adversely affected African-American applicants or that SEPTA intentionally enforced its policies despite or because of such adverse impact."  (Def.'s Mem. Opp. Mot. Class Cert. 19.)  Such failure, it claims, cannot withstand the "rigorous" analysis required by the Third Circuit.

While Defendant's arguments as to the substance of Plaintiff's underlying case may have merit in the context of a motion for summary judgment, they are ill-timed on a motion for class certification.  The Third Circuit has indicated that a motion for class certification allows a district court to make a "*preliminary* inquiry" into the merits of the case.  Hydrogen Peroxide, 552 F.3d at 317 (emphasis added).   Such a preliminary inquiry, however, does not require the plaintiff to come forth with evidence – generally only obtained once merits discovery is completed – proving or establishing by a preponderance of the evidence the merits of his claims.  Indeed, while a district court may address arguments that go to the merits of a plaintiff's cause of action insofar as they also implicate the class certification decision, the Third Circuit has reaffirmed its prior holding in Newton, 259 F.3d at 166-67, to preclude a merits inquiry that is not necessary to a Rule 23 determination.  Hydrogen Peroxide, 552 F.3d at 317-18.

Defendant's reliance on Hydrogen Peroxide statement improperly interprets it as

20

authorizing an inquiry into whether Plaintiff's legal theory is "susceptible to proof at trial."  In reality, the full sentence directs a district court to consider whether plaintiff's legal claim, if plausible in theory, "is also susceptible to proof at trial *through available evidence common to the class*."  Id. at 325 (emphasis added).  It is the latter part of this sentence – whether the relevant evidence is common to the class – that is pertinent to a motion for class certification and which is properly subsumed within the Rule 23(a) factors.

In short, Defendant's attacks on the dearth of evidence to prove Plaintiff's underlying claims simply do not implicate the class certification decision.  Defendant will have the opportunity to attack the merits of Plaintiff's case, be it a class or individual action, during summary judgment proceedings.  If Plaintiff cannot produce any evidence of any disparate impact, or any evidence of Defendant's intent to discriminate, summary dismissal will be forthcoming.  At this juncture, however, the Court must assume that Plaintiff's legal theory is plausible – a decision already made in ruling on Plaintiff's Motion for Leave to Amend – and must consider, under the auspices of Rule 23, only whether it may be proved by evidence common to the class.

### 3.    Whether Certification Must Be Denied Because of the Considerable Potential for Unwarranted Settlement Pressure

In its third and final general argument against class certification, Defendant contends that Plaintiff's claims are utterly baseless and certification of his proposed class "will serve no purpose other than to greatly increase SEPTA's litigation costs, thereby affording [Plaintiff's] counsel the opportunity to exert unwarranted settlement pressure."  (Def.'s Mem. Opp. Mot. Class Cert. 20.)  While the Court acknowledges Defendant's concerns, we decline to deny class

certification on this ground.

The Third Circuit has noted that the trial court's discretion in deciding certification motions does not "soften the rule" that "a class may not be certified without a finding that each Rule 23 requirement is met." Hydrogen Peroxide 552 F.3d at 310. Explaining the basis behind this rigorous requirement, the court noted that "[i]n some cases, class certification 'may force a defendant to settle [relatively weak claims] rather than incur the costs of defending a class action and run the risk of potentially ruinous liability.'" Id. (quoting FED. R. CIV. P. 23 advisory committee's note, 1998 Amendments). As such, the court held that "the potential for unwarranted settlement pressure 'is a factor we weigh in our certification calculus.'" Id. (quoting Newton, 259 F.3d at 168 n.8)

The Court does not take this consideration lightly, particularly in view of our notation in the Memorandum and Order dated March 10, 2009, that the Second Amended Complaint contains a notable paucity of allegations suggesting either disparate impact or discriminatory intent. Jackson v. SEPTA, Civ. A. No. 08-4572, 2007 WL 637460, at *12 (E.D. Pa. Mar. 10, 2008). Moreover, the Court remains aware that class certification would substantially escalate both parties' litigation costs and might unfairly prompt a settlement where Defendant would otherwise never consider one. Nonetheless, the Court cannot simply deny certification on this ground. Rather, as noted by the Third Circuit, we keep this consideration in mind when conducting the "rigorous" analysis of the Rule 23 factors and assuring that all of the elements are satisfactorily met by a preponderance of the evidence.

B.    **Rule 23(a) Requirements**

Having considered Defendant's general arguments against class certification, the Court turns to the preliminary analysis under Federal Rule of Civil Procedure 23(a).  As noted above, Federal Rule of Civil Procedure 23 sets forth four general preconditions that a putative class complaint must satisfy before any case is certified as a class action:  (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class.  FED. R. CIV. P. 23(a).  The requirements of Rule 23(a) are meant to assure both that "class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances."  Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).  A "Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  Falcon, 457 U.S. 147 at 161.

1.    **Numerosity**

To establish the first prerequisite of Rule 23(a), a plaintiff seeking certification must demonstrate that the class is so numerous that joinder of all members is impracticable.  FED. R. CIV. P. 23(a).  "No magic number exists satisfying the numerosity requirement, nor must plaintiff allege the exact number or identity of class members."  Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989); see also Chakejian v. Equifax Info. Servs., LLC, 256 F.R.D. 492, 497 (E.D. Pa. 2009).  Instead, "it is proper for the court to accept common sense assumptions in order to

23

support a finding of numerosity." Moskowitz, 128 F.R.D. at 628 (quotations and internal

quotation marks omitted); see also Lloyd v. City of Phila., 121 F.R.D. 246, 249 (E.D. Pa. 1988)

(noting that a court may certify a class whose size is unknown "if common sense or common

knowledge indicates that it will be large.").  Although the numerosity requirement is to be

applied liberally in gender and race discrimination suits, Frazier v. SEPTA, 123 F.R.D. 195, 197

(E.D. Pa. 1988), a plaintiff in such a case must still prove that the numerosity requirement is

satisfied.  Gurmankin v. Costanzo, 626 F.2d 1132, 1135 (3d Cir. 1980); see also Nelson v. Astra

Merck, Inc., Civ. A. No. 98-1293, 1998 WL 737982, at *2-3 (E.D. Pa. Oct. 22, 1998) (in a suit

claiming discrimination against African-Americans based on a company's terms and conditions

of employment, the plaintiffs' allegation that the company employed "hundreds of black persons"

in the United States was insufficient to establish numerosity).

Notably, the numerosity test is one of practicability of joinder.  Impracticability is a

"subjective determination based on number, expediency, and inconvenience of trying individual

suits." Pabon v. McIntosh, 546 F. Supp. 1328, 1333 (E.D. Pa. 1982); 7 Charles A. Wright, et al.,

7 FEDERAL PRACTICE AND PROCEDURE § 1762 (1972).  Thus, "[t]his requirement does not

demand that joinder would be impossible, but rather that joinder would be extremely difficult or

inconvenient." Szczubelek v. Cendant Mortgage Corp. 215 F.R.D. 107, 116 (D.N.J. 2003).

Whether joinder of all of the class members would be impracticable depends on the

circumstances surrounding the case and not merely on the number of class members. See

Slapikas v. First Am. Title Ins. Co., 250 F.R.D. 232, 240 (W.D. Pa. 2008).  While the Third

Circuit has declined to set forth any hard and fast number required to satisfy this element, it has

generally noted that:

24

> [S]ome general tendencies can be observed. While there are exceptions, numbers under twenty-one have generally been held to be too few.  Numbers between twenty-one and forty have evoked mixed responses and again, while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.

Weiss v. York Hosp., 745 F.2d 786, 808 n.35 (3d Cir. 1984) (citing 3B J. Moore, MOORE'S FEDERAL PRACTICE ¶ 23.05[1], at 23-150 (2d ed.1982) (footnotes omitted)); see also Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) ("generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").

In the present case, Plaintiff's sole arguments concerning numerosity are as follows:

> The members of this class are so numerous that joinder of all its members would be impractical.  Plaintiff's investigation has shown that Defendant SEPTA entered into contracts with at least seven paratransit providers during the Class Period, and that the enforcement and interpretation of Defendant SEPTA's policy likely caused hundreds of African-American applicants or employees to be denied employment or terminated in that time.

(Pl.'s Mem. Supp. Mot. Class Cert. 10.)  He goes on to contend:

> As previously noted, during the period of time covered by the Complaint, Plaintiff and putative class members are African-Americans who were terminated or were refused employment by Defendant or its contracted paratransit providers on the grounds of possessing a criminal record, and were convicted of previous felony or misdemeanor charges, regardless of whether the charges stemmed from violent crime or misdemeanor, or the length of time since the criminal action occurred, or whether the individual has proved for a substantial period of time that [they] are a viable productive member of society.

> Moreover, numerous class members have been forced to leave the industry because of defendants' discriminatory conduct and may have dispersed throughout the United States, which is a factor rendering joinder impractical. . . . At the same time, the class is not so numerous as to pose manageability problems, and is well within the range of many civil rights classes that have been certified by the federal courts.

(Id. 18-19.)

Such bald allegations, however, are insufficient to establish numerosity.  As a primary matter, the relevant time period has been drastically restricted by the applicable statute of limitations.  While Plaintiff originally sought to certify a class of individuals terminated or denied employment with SEPTA from July 1, 2003, to the present, the two-year limitations period for section 1983 actions requires that three years and two-and-a-half months be trimmed from that duration, and that the class be limited to a time period from September 19, 2006, to the present.  Moreover, the class definition of "[a]ll people" has been limited, pursuant to Plaintiff's own theory of liability, to only African-Americans.

The question then becomes whether Plaintiff has made a sufficient showing of numerosity among this racial group for this approximately three year period.  Aside from bare speculation that SEPTA's criminal record policy "likely" caused hundreds of African-Americans to be denied or terminated from employment as a bus or paratransit driver with SEPTA and its subcontractors, Plaintiff fails to produce any evidence to support his assertions.  Despite the existence of SEPTA's on-line application system, and despite the fact that Plaintiff has had ample opportunity to conduct class discovery and obtain the system's data from SEPTA, Plaintiff has not offered this Court any informed estimate of how many people applied for or were terminated from bus or paratransit operators during the relevant time period, let alone how many of those applicants were African-American and how many of those job denials or terminations were based solely on the individuals' criminal history records.  Nor does Plaintiff's counsel aver, by way of declaration or affidavit, that he has investigated this matter and found numerous individuals, beyond those named in the Jackson and Butler actions (a total of four plaintiffs),

26

who fall within the class definition. By contrast, Defendant has produced evidence that, as of

June 16, 2009, 80.8% of its bus operators were African-American, four times more than all other

racial/ethnic groups combined.  (Def.'s Opp. Mot. Class Cert., Carol O'Neal Decl. ("O'Neal

Decl."), ¶ 4.)  Moreover, at least four of the six paratransit companies with whom SEPTA

contracts has a driver workforce consisting of more than sixty percent African-Americans.[5]  In

the face of such unrebutted evidence, Plaintiff's bare allegation fails to carry his burden.

Finally, despite Plaintiff's speculation that "numerous class members have been forced to

leave the industry because of defendants' discriminatory conduct and *may* have dispersed

throughout the United States, which is a factor rendering joinder impractical," Plaintiff has

neither indicated any affirmative basis for this speculation nor put forth a scintilla of evidence in

support.  (Pl.'s Mem. Supp. Mot. Class Cert. 18 (emphasis added)); see Osgood v. Harrah's

Entm't, Inc., 202 F.R.D. 115, 122 (D.N.J. 2001) (indicating that geographic dispersion of class

members weighs on the Rule 23(a)(1) inquiry); Mardsen v. Select Med. Corp., 246 F.R.D. 480,

484 (E.D. Pa. 2007) (same).  Plaintiff has not, at minimum, identified even one potential class

member outside the Philadelphia area.

While the law is well-established that a plaintiff "need not show the exact number of

potential numbers in order to satisfy the [numerosity] requirement," it is equally well-established

that "the plaintiffs do have the burden of showing that the size is such that the joinder of all

members is impracticable.  Mere speculation as to the number of members who may be involved

---

[5]  The percentages are as follows:  First Transit – 81% American American; Edens – 82% African-American; Community Transport – 60% African-American; MV Transit – 74% African-American.  (Brandis Decl. ¶ 8.)  Only ten percent of Krapf's drivers are African-American, but Krapf employs only twenty drivers.  (Id.)  The parties have provided no data for Triage, Inc.

is not sufficient to satisfy Rule 23(a)(1)." <u>Delgado v. McTighe</u>, 91 F.R.D. 76, 78 (E.D. Pa.

1981); <u>see also</u> <u>Williams v. Empire Funding Corp.</u>, 183 F.R.D. 428, 437 (E.D. Pa. 1998)

("Although plaintiff does not have to recite a "'magic minimum number . . . mere speculation

does not satisfy Rule 23(a)(1).'") (internal quotations omitted).  Notwithstanding this burden,

Plaintiff has failed to offer this Court anything more than a suggestion that there are "likely"

hundreds of individuals who fall within the class definition.  That assertion shows neither

sufficient numerosity nor impracticability of joinder.  Accordingly, the Court deems Rule

23(a)(1) unsatisfied.

       Were this the only defect in Plaintiff's Motion for Class Certification, the Court would be

likely to deny it without prejudice to allow Plaintiff to provide some sort of estimate or viable

claim of numerosity.  <u>See</u> <u>Bennett v. Corr. Med. Servs.</u>, Civ. A. No. 02-4993, 2008 WL 2064202,

at *12 n.16 (D.N.J. May 14, 2008).  As the Motion fails on other grounds, however, we decline

to do so.

       **2.**   <u>**Commonality**</u>

       The commonality requirement is satisfied "if the named plaintiff shares at least one

question of fact or law with the grievances of the prospective class."  <u>See</u> <u>Baby Neal</u>, 43 F.3d at

56.  "[F]actual differences among the claims of the putative class members do not defeat

certification."  <u>Id</u>.  Under earlier class-action jurisprudence, courts, applying an

"across-the-board" theory, would routinely find the commonality requirement met where an

individual plaintiff alleged company-wide or pervasive employment discrimination.  <u>Miller v.</u>

<u>Hygrade Food Prods. Corp.</u>, 89 F. Supp. 2d 643, 648 (E.D. Pa. 2000) (discussing history of

28

across-the-board employment discrimination suits).  Thus, a named plaintiff could represent a

class consisting of all persons affected by the employer's discriminatory practice, even though

the individual plaintiff had been adversely affected by only one such practice.  Id.

In Gen. Tel. of Sw. v. Falcon, supra, however, the United States Supreme Court "pulled

in the reins" on "across the board" employment discrimination class actions "by insisting on

actual, not presumed, compliance with the typicality and commonality provisions of Rule 23."

Goodman v. Lukens Steel Co., 777 F.2d 113, 122 (3d Cir. 1985) (citing Falcon, 457 U.S. 147).

Finding that the plaintiff's employment discrimination claims in that case had not satisfied the

commonality requirement, the court explained:

> Conceptually, there is a wide gap between (a) an individual's claim that he has
> been denied a promotion on discriminatory grounds, and his otherwise
> unsupported allegation that the company has a policy of discrimination, and (b)
> the existence of a class of persons who have suffered the same injury as that
> individual, such that the individual's claim and the class claims will share
> common questions of law or fact and that the individual's claim will be typical of
> the class claims.  For [plaintiff] to bridge the gap, he must prove much more than
> the validity of his own claim.

Falcon, 457 U.S. at 157-58 (footnote omitted).  More specifically, the plaintiff must establish that

the discriminatory practice was pervasive or was reflected in other employment activities.

Goodman, 777 F.2d at 122.

Although the Supreme Court did not eliminate across-the-board class actions, it made the

pursuit of such claims significantly more onerous.  Thus, conclusory allegations of discrimination

on a class-basis are no longer sufficient.  See Donaldson v. Exelon Corp., Civ. A. No. 05-1542,

2006 WL 2668573, at *2 (E.D. Pa. Sep. 14, 2006) (citing Falcon).  A plaintiff must produce

evidence "usually in the form of affidavits, statistical evidence, or both, tending to show that the

individual claims share questions of fact or law with the class claims and that the individual claims are typical of those brought for the class."  See Reap v. Cont'l Cas. Co., 199 F.R.D. 536, 544 (D.N.J. 2000); Herbert B. Newberg, 5 NEWBERG ON CLASS ACTIONS § 24.13, at 24-52 to 24-54 (3d ed. 1992).

Moreover, a finding of commonality is disfavored where the application of the policy or challenged employment decision is decentralized in nature.  Jones v. GPU, Inc., 234 F.R.D. 82, 92 (E.D. Pa. 2005).  Specifically,

> [i]f certification of a class alleging only decentralized decision making is difficult, it is even more difficult where the proposed class is comprised of employees who were subject to both decentralized and centralized decision making.  Plaintiffs who allege centralization as to one employment practice and *decentralization* as to another cannot show, as required by Falcon*, that the class was affected by the challenged practices *in the same way.* Without such a showing, the requirement that class certification be based on more than mere membership in a protected class is not met.

Id. at 92 (emphasis in original).[6]

At first blush, the current case appears to challenge a single, centralized, uniform policy within SEPTA – the criminal record policy – which, according to Plaintiff, constitutes intentional discrimination by Plaintiff against African-Americans.  Plaintiff asserts that this policy presents

---

[6]  In Jones, the court set forth a list of factors to be analyzed in determining whether commonality exists in a discrimination case.  The court considered:  (1) the nature of the alleged discriminatory practice; (2) whether the practice's effects are actually felt on a classwide basis; (3) whether the challenged practice is uniform or diverse, considering such factors as the size of the company, the number of facilities or locations involved, extent of diversity of occupations and employment conditions, degree of geographic diversity and local autonomy; (4) the uniformity or diversity of the class members; (5) the nature of the company's organizational structure as it relates to the centralized or decentralized supervision process of the challenged employment practice and policies; and, (6) the length of time covered by the plaintiffs' claims and whether the challenged conditions prevailed during the entire period.  Id. at 90.

multiple questions of law and fact common to the class that predominate over individual

questions, including the following:

a.   whether Defendant SEPTA's uniform policy has a disparate effect on
     African-Americans;

b.   whether Defendant SEPTA intentionally selected, instituted, maintained
     and reaffirmed its uniform employment policy because of its adverse
     effects on African-American job applicants with an intent to purposefully
     discriminate against the Class in violation of 42 U.S.C. § 1981 thereby
     providing a claim for relief under 42 U.S.C. § 1983;

c.   whether Defendant SEPTA's official criminal record policy as written and
     enacted, served to deprive Plaintiff Jackson and other African-American
     job applicants of their property without due process with an intent to deny
     those individuals of their rights by terminating and/or denying
     employment to those individuals based solely on their criminal records;

d.   whether companies providing paratransit services to Defendant SEPTA
     and companies providing screening and staffing services for such
     companies enforced and interpreted Defendant SEPTA's uniform
     employment policy in a manner that had a disparate impact on African-
     Americans and served to deprive Plaintiff Jackson and other African-
     American job applicants of their rights by terminating and/or denying
     employment to those individuals based solely on their criminal records;

e.   Whether companies providing paratransit services to Defendant SEPTA
     and such paratransit companies providing screening and staffing services
     for those companies enforced and interpreted Defendant SEPTA's uniform
     employment policy in a manner that violated 42 U.S.C. § 1981 thereby
     providing a claim for relief under 42 U.S.C. § 1983;

f.   whether Plaintiff and the Class are entitled to equitable and/or injunctive
     relief as a result of the harm caused by SEPTA's uniform employment
     policy, its interpretation and its application, and, if so, the nature of such
     relief; and

g.   whether Plaintiff and the Class are entitled to monetary damages for their

denials of employment and illegal terminations and, if so, the nature and
amount of such damages.

(Pl.'s Mem. Supp. Mot. Class Cert. 21-23.)

Upon closer and more "rigorous" scrutiny, however, Plaintiff's satisfaction of the
commonality requirement appears to dissolve.  Plaintiff combines into one class all African-
Americans who have been either terminated from employment or denied employment as a driver
for *either* SEPTA *or* any company that has provided paratransit services for SEPTA because of a
past felony or misdemeanor conviction.  Several problems arise from any effort to define a
common question among the individuals in such a class.  First, Plaintiff fails to recognize that
different policies are at issue.  The SEPTA policy, as defined above, indicates that conviction
records or information about convictions "*may be considered*" by SEPTA and, ultimately, if
SEPTA decides not to hire an applicant, based in whole or in part on the applicant's criminal
history, SEPTA shall notify the applicant in writing setting forth the basis for the rejection.
(Flower Decl., ¶ 13, Ex. 1.)  By contrast, SEPTA's 2004 contract with its paratransit service
providers blanketly *prohibits* the subcontractor from hiring as a paratransit driver anyone
currently on probation or parole or anyone with a record for certain types of crimes, including
driving under the influence of alcohol (DUI); vehicular homicide; possession of any drug with
the intent to deliver; a felony of any kind; a sexually related offense; a felony or misdemeanor for
forgery, falsification of records, or false swearing to authorities; or a misdemeanor within the
past seven years not other otherwise included in the above list.  (Brandis Decl. ¶ 3, Ex. 1.)  The
2006 Bucks County contract with First Transit expanded the list of automatically disqualifying
offenses for the position of paratransit driver.  (Id. ¶ 5, Ex. 3.)  Finally, the paratransit providers

32

have their own policies for consideration of criminal records, which, in some cases, are more restrictive than SEPTA's policy. Accordingly, there is no company-wide or uniform policy or practice common to all members of the defined class. Rather, the individuals would have to be divided into whether they applied for or were terminated from a bus driver position with SEPTA under the discretionary criminal record policy, whether they applied for or were terminated from a paratransit position with one of SEPTA's subcontracting paratransit providers under the prohibitory criminal record policy, or whether they applied for or were terminated from a paratransit position with one of SEPTA's subcontractors under the subcontractor's criminal record policy.

Second, there is significant decentralization in decision-making between SEPTA and its paratransit providers. Within SEPTA, the decision regarding whether an individual may be hired as a bus driver is concentrated under the Senior Director, Human Resources, in consultation with SEPTA's legal Department and the Deputy General Manager. (Flower Decl. ¶ 13, Ex. 1.) The six paratransit subcontractors, however, engaged in their own autonomous employment decisions and, while they were governed by SEPTA's contractual restrictions, they maintained their own system management plans for hiring. (Brandis Decl. ¶ 9.) Proof of Plaintiff's claim would demand a probe into the decision-making processes of the individual companies. The existence of a class containing centralization as to one employment practice and decentralization as to another fails to show that "the class was affected by the challenged practice *in the same way*." Jones, 234 F.R.D. at 92 (emphasis in original).

This Court remains cognizant of the fact that "[a] finding of commonality does not require that all class members share identical claims, and indeed 'factual differences among the

33

claims of putative class do not defeat class certification.'" In re Prudential Co. of Am. Sales

Practices Litig. Agent Actions, 148 F.3d 283, 310 (3d Cir. 1998) (quoting Baby Neal, 43 F.3d at

56); see also Brooks v. Educators Mut. Life Ins. Co., 206 F.R.D. 96, 101–02 (E.D. Pa. 2002)

(recognizing that individualized issues in a proposed class does not *per se* defeat commonality

and may be more appropriately addressed under the stricter Rule 23(b)(3) predominance

requirement).   "If the named plaintiff shares at least one question of law or fact with the

prospective class, the commonality requirement is satisfied."  Williams v. Empire Funding Corp.,

183 F.R.D. 428, 438 (E.D. Pa. 1998).  The problem, in this case, is that while some of class

members perhaps share some questions with some other members of the class, none of the class

members, including the named Plaintiff, share any one question with all of the class.  Given the

individualized and fact-specific nature of the issues in this case, the Court concludes that the

class, both as defined by Plaintiff and re-defined by the Court, fails to satisfy the commonality

factor.

### 3.  Typicality

Although they are distinct requirements under Rule 23(a), "[t]he concepts of commonality

and typicality are broadly defined and tend to merge."  Baby Neal, 43 F.3d at 56.  Both focus on

whether a class can be practically, efficiently, and fairly maintained.  Barabin v. Aramark Corp.,

210 F.R.D. 152, 159 (E.D. Pa. 2002).  Typicality, however, "requires a strong similarity of legal

theories to ensure that the class representatives' pursuit of their own goals will work to benefit

the entire class."  Jones, 234 F.R.D. at 97.  "While typicality is not synonymous with identicality,

all of the claims must arise from the same policy, practice, or course of conduct."  Id.  The

typicality requirement endeavors to align the interests of the class and the class representatives so

that the latter will work to benefit the entire class through the pursuit of their own goals.  Barnes, 161 F.3d at 141.  "Where an action challenges a policy or practice, 'the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.'"  Chakejian v. Equifax Info. Sys., 256 F.R.D. 492, 498 (E.D. Pa. 2009) (quoting Baby Neal, 43 F.3d at 58).  "'The heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims.'"  In re Janney Montgomery Scott LLC Fin. Consultant Litig., Civ. A. No. 06-3202, 2009 WL 2137224, at *4 (E.D. Pa. Jul. 16, 2009) (quoting Seidman v. Am. Mobile Sys., Inc., 157 F.R.D. 354, 360 (E.D. Pa. 1984)).  "When the named plaintiffs and putative class members seek to challenge the same allegedly unlawful conduct, the typicality requirement is usually satisfied even though different fact patterns may underlie the individual claims."  Janney Montgomery, 2009 WL 2137224, at *4.

As noted above, the current class definition challenges three different policies: (1) SEPTA's criminal record policy as to the hiring of bus drivers; (2) SEPTA's criminal record contract requirements imposed on the paratransit subcontractors; and (3) the subcontractors own criminal record policies.  While Plaintiff's basic claim seems similar to others challenging the same policies, his case is not clearly "typical" for purposes of class certification.  As to the first category, the Second Amended Complaint indicates that Plaintiff is an African-American who applied on three separate occasions for bus operator positions with SEPTA:  2002, March 2005, and March 2006.[7]  As indicated above, the 2002 denial falls outside of the two-year statute of

---

[7] Defendant has submitted no evidence regarding the first application.  As such, the Court takes the allegations of the Second Amended Complaint as true.  With respect to the

limitations and, thus, is not actionable.  The second application was denied due to the absence of a work history and not because of any criminal conviction.[8]  As to the third application, the Second Amended Complaint alleges that Plaintiff was denied "solely due to his prior criminal record."  (Sec. Am. Compl. ¶ 37.)  While this claim, on its face, is typical of a class challenging the lawfulness of that policy, Plaintiff fails to acknowledge that typicality is virtually impossible under SEPTA's discretionary policy.  Plaintiff does not establish, beyond his bare allegation, that his criminal history was the sole basis for his denial of employment and that there were no reasons unique to Plaintiff's application.  See Beck v. Maximus, 457 F.3d 291, 297 (3d Cir. 2006) (cautioning against finding typicality where the class representative is subject to a "defense unique to [the] class representative's interests" since "the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class.").  As noted by Defendant, Plaintiff's failure to disclose the fact of his conviction on his second application may alone, under SEPTA's policy, be grounds for disqualification from employment.  (Flower Decl. ¶ 13, Ex. 1.)

Similarly, as to the second category, Plaintiff alleges that, in early 2003, he was employed with Triage, Inc., a paratransit provider that contracts with SEPTA.  (Sec. Am. Compl. ¶¶ 9, 22.) He remained with Triage until 2005, when he was laid off due solely to the company's financial

_____

second application, the Second Amended Complaint alleges that it was submitted in 2004, but unrebutted evidence from the Defendant reveals that it was submitted in March 2005.

[8]  As Plaintiff did not disclose any criminal history in his second application and SEPTA never performed a criminal record check in connection with this application, criminal history could not have been the basis for that application's denial.

difficulties and not to his criminal background.  (Id. ¶ 22.)  In August 2005, he was hired as a paratransit driver for SEPTA subcontractor First Transit.  (Id. ¶ 34.)  He remained in that position, notwithstanding the 2006 change in SEPTA policy prohibiting employment of individuals with certain convictions, due to his good standing with the company.  (Id. ¶ 36.)  On December 13, 2007, Plaintiff was notified of another change in SEPTA's employment and terminated, at SEPTA's directive, solely because of his prior criminal record.  (Id. ¶ 38.)  Given such facts, Plaintiff's case is again not clearly typical of a class of individuals challenging the lawfulness of SEPTA's contractual criminal history policy imposed on its paratransit providers. Notwithstanding the puportedly prohibitory nature of SEPTA's and/or the paratransit providers' policies, Plaintiff actually was hired as a paratransit driver by two different SEPTA subcontractors and remained with one company for more than two years – even being "grandfathered" in the face of a new SEPTA policy.  Such facts significantly distinguish Plaintiff from a class member who challenges SEPTA's policy as having a disparate impact on African-Americans by completely barring them from employment due to their criminal convictions.

Finally, even if Plaintiff's claims could be deemed typical of the above two categories, the class is defined to include *all* African-Americans denied or terminated from employment as a paratransit driver with any of SEPTA's six paratransit subcontractors under the subcontractors' individual criminal history policies.  Plaintiff, according to his own allegations, has no typicality with such a category.   Thus, while Plaintiff's claim is aligned with some of the class members, it is not aligned with all of the class members.  Accordingly, the Court declines to deem this element satisfied.

4.    **Adequacy**

The adequacy of representation requirement encompasses two distinct inquiries designed to protect the interests of absentee class members.  First, it "tests the qualifications of the counsel to represent the class."  In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995).  Second, it considers whether the named plaintiff's interests are sufficiently aligned with those of the absentee members and serves to uncover conflicts of interest.  Id. Unlike the other Rule 23(a) factors, "[a] party challenging the class' representation has the burden to prove that the representation is not adequate."  Wilson v. County of Gloucester, 256 F.R.D. 479, 487-88 (D.N.J. 2009) (quoting Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 233 (D.N.J. 2005)).[9]

The adequacy of counsel requirement inquires whether the class attorneys will "competently, responsibly and vigorously prosecute the suit."  See Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp., 149 F.R.D. 65, 78 & n. 23 (D.N.J. 1993) (quotations omitted).  The plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation.  Weiss v. York Hosp., 745 F.2d 786, 811 (3d Cir. 1984); Liberty Lincoln Mercury, 149 F.R.D. at 78.

The adequacy of the class representative inquiry demands that "a class representative . . . be part of the class and 'possess the same interest and suffer the same injury' as the class members."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (citing East Texas

---

[9]  Defendant argues that Plaintiff's "efforts to meet his burden as to 'adequacy' is meager," in light of his single page of briefing.  (Def.'s Resp. Mot. Class Cert. 28.)  This argument fails to realize that the burden actually falls on Defendant to disprove adequacy. Wilson, 256 F.R.D. at 487-88.

Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)).  The interests of the class representative and the absentee class members need not be identical, but must not be antagonistic.  Barel v. Bank of Am., 255 F.R.D. 393, 399 (D.N.J. 2009).  Additionally, Plaintiff must be willing to serve as class representative and willing to vigorously prosecute the case. Meyer v. CUNA Mut. Group, Civ. A. No. 03-602, 2006 WL 197122, at *20 (W.D. Pa. Jan. 25, 2006).

Defendant first argues that "[t]he ability of Jackson's counsel to keep up with the demands of the proposed class action appears doubtful," since the corresponding Butler case has been pending for nineteen months with little active prosecution.  (Def.'s Resp. Mot. Class Cert. 30.)  The Court takes notice, however, that counsel for Plaintiff are several well-known, seasoned, and respected civil rights attorneys.  (Pl.'s Mot. Class Cert., Ex. A.)  In addition, the delays in this particular action have been minimal, if any.  Aside from Defendant's speculation, the Court has no basis to doubt the ability of these attorneys to represent a class.

Defendant also alleges that Plaintiff is not an adequate representative on two grounds, neither of which this Court finds convincing.  First, it claims that Plaintiff's case is particularly weak since his convictions were for criminal offenses of a sexually deviant nature and he was disqualified from the bus operator and paratransit driver positions precisely because of the nature of those offenses.  (Def.'s Resp. Mot. Class Cert. 29.)  The Court does not find that such factual distinctions makes his interests antagonistic to the class.  Indeed, although Plaintiff's convictions were of a sexually deviant nature, they were misdemeanors and occurred in connection with a 1993 incident – almost a decade prior to his first application to SEPTA and approximately thirteen years prior to his termination from First Transit.

39

Second, Defendant, citing to Dotson v. Portfolio Recovery Assoc., L.L.C., Civ. A. No. 08-3744, 2009 WL 1559813, at *2 (E.D. Pa. Jun. 3, 2009), argues that because Plaintiff falsified his first two applications for a SEPTA bus operator position by denying any prior criminal history, he would be unable to provide credible, unimpeachable testimony at trial in order to adequately represent his class. Again, Defendant's argument is unavailing. In Dotson, the court found that plaintiff had given "false testimony under oath," making him impeachable on cross examination, unable to provide credible testimony, and inadequate to protect the interests of the absent class members. Id. at *3-4. By contrast in this case, Plaintiff, albeit deceptively, failed to check off a box on his employment application indicating that he had a prior criminal conviction – he was not under any oath at the time. While this failure may be used to impeach him, it does not, unlike the plaintiff in Dotson, render him so incredible as to make him an inadequate class representative.

### 5.    Conclusion as to Rule 23(a) Factors

In light of the foregoing analysis, the Court must deny class certification. Aside from the fact that Plaintiff has failed to establish numerosity, he simply cannot establish that all members of the proposed class share at least one common question or that Plaintiff's case is typical of all class members. Accordingly, we reject class certification on these grounds.

### C.    Rule 23(b) Factors

Even assuming the other barriers to certification under Rule 23(a) could be remedied, the Court remains obligated to discuss the Rule 23(b) factors. As discussed above, the proponent of class certification bears the burden of proving that the class fits within one of the Rule 23(b)

categories.  Chiang, 385 F.3d at 264.  Plaintiff, in this case, seeks certification under both 23(b)(2) and 23(b)(3).  The court discusses each individually.

### 1.  Rule 23(b)(2)

Under Rule 23(b)(2), a class action is maintainable if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . ." FED. R. CIV. P. 23(b)(2).  Section (b)(2) was "'designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons.'"  Barnes v. Am. Tobacco Co., 161 F.3d 127, 142 (3d Cir. 1998) (quoting 1 NEWBERG ON CLASS ACTIONS § 4.11, at 4-39).  The fact that plaintiffs seek injunctive relief alone, however, is not sufficient to obtain certification under Rule 23(b)(2).  Brooks, 206 F.R.D. at 104.  The Advisory Committee's note to Rule 23(b)(2) specifies that "[t]he subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages."  FED. R. CIV. P. 23(b)(2) advisory committee's note, 1966 Amendment; see also Hohider v. United Parcel Serv., Inc., __ F.3d __, 2009 WL 2183267, at *20 (3d Cir. Jul. 23, 2009).

Plaintiff contends that this matter falls squarely in the bounds of Rule 23(b)(2), as it is primarily an action for injunctive relief, with only an incidental request for monetary damages. The Third Circuit recently addressed a similar claim in Hohider v. UPS, where a plaintiff requested Rule 23(b)(2) certification of a class of individuals asserting a policy of discrimination in violation of Title VII and the ADA against the defendant employer.  2009 WL 2183267, at *1-

41

2.  The district court had certified the class to the extent that the plaintiffs sought injunctive and declaratory relief, and left open "the possibility that plaintiffs may seek, in addition to injunctive and declaratory relief, 'back pay or other equitable relief for individual class members if there is a protocol for identifying those monetary damages which sets forth the objective standards to be utilized in determining the amount of those damages in a way that does not require additional hearings on individualized circumstances'" Id. at *20.  However, it severed plaintiffs' claims for compensatory and punitive damages from the certification, finding that they were not incidental to the injunctive and declaratory relief sought.  Id.

On appeal, the Court found that, aside from not meeting the Rule 23(a) factors, the class failed to satisfy the Rule 23(b)(2) analysis.  Specifically, it noted that even if a finding of liability and an award of injunctive and declaratory relief could be reached on a classwide basis without addressing these individualized inquiries, plaintiffs' request for compensatory and punitive damages would be ineligible for class treatment since they would require individual inquiries to address certain questions of individual relief with respect to each class member.  Id. at *21. Further, the Third Circuit rejected the district court's efforts to sever the compensatory and punitive damages from the class certification, noting that "[o]nce the District Court decided that plaintiffs' compensatory and punitive damages claims were incompatible with Rule 23(b)(2) . . . it did not explain why this determination did not interfere with certification of the class for other purposes, nor did it address what effect, if any, such partial certification would have on the class action going forward."  Id.  Finally, the Third Circuit disagreed with the district court's conditional certification of plaintiffs' request for back pay, holding that "even if the District Court were correct that plaintiffs' claims of injunctive and declaratory relief could be properly

certified under Rule 23(b)(2), it was not sufficient for the court simply to identify back pay as

potentially incidental to such relief, and grant it certification on the condition that it later prove to

be so."[10] Id. at *22.  "Rather, before moving forward with certification, it was necessary for the

court to determine whether plaintiffs' back-pay request actually conforms with the requirements

of Rule 23, including Rule 23(b)(2)'s monetary-predominance standard."  Id. at *22 (citing

Allison v. Citgo Petrol. Corp., 151 F.3d 402, 415 (5th Cir. 1998) (stating that monetary relief

deemed "incidental" and thus certifiable under Rule 23(b)(2) "should at least be capable of

computation by means of objective standards and not dependent in any significant way on the

intangible, subjective differences of each class member's circumstances"); Robinson v. Metro-

North Commuter R.R. Co., 267 F.3d 147, 164 (2d Cir. 2001) (finding that "non-incidental"

---

[10]  Plaintiff cites to Professor Newberg, a foremost authority on class actions, for the
proposition that, where both injunctive relief and damages are sought:

> It is counterproductive for the court to expend time to try to resolve this largely
> discretionary question [of whether one is incidental to the other], which does not
> address the merits of the case.  Rather the court should conclude that when the
> Rule 23(a) prerequisites are satisfied and declaratory or injunctive relief is sought
> as an integral part of the relief for the class, then Rule 23(b)(2) is applicable
> regardless of the presence or dominance of additional prayers for damages relief
> for class members.

(Pl.'s Mem. Supp. Mot. Class Cert. 35 (quoting 1 Herbert Newberg, NEWBERG ON CLASS
ACTIONS § 4.14, at 4-50,51 (3d ed. 1992).)

The Third Circuit, in Hohider, squarely rejected any such proposition, emphasizing that
"[w]hile courts retain discretion under Rule 23(c)(1)(C) to alter or amend before final judgment
an order granting or denying class certification . . . courts should not grant certification except
after searching inquiry, and . . . should not rely on later developments to determine whether
certification is appropriate."  Id. at *22 (internal quotation marks and citations omitted).  In so
ruling, it disapproved of the district court's bare conclusion that a claim of back pay that
accompanied a prayer for injunctive relief could be conditionally certified without a rigorous
analysis as to whether such monetary relief could be awarded on a class-wide basis by objective
standards.  Id.

43

monetary relief may not be certified under Rule 23(b)(2) if it cannot be adjudicated on a classwide basis in an "efficient and manageable" fashion)).

In the case at bar, despite Plaintiff's efforts to characterize his Second Amended Complaint as seeking primarily injunctive and equitable relief, the fact remains that he also seeks a variety of monetary damages including front pay, back pay, lost fringe benefits, lost pension benefits, damages for pain, suffering, humiliation, and mental anguish, and punitive damages. (Sec. Am. Compl. 18-19.)  Unlike those civil rights actions wherein the individual claims have little to no monetary value and seek primarily declaratory relief to correct an unconstitutional practice, this case requests substantial financial damages.  More importantly, most of the requested damages are not subject to across-the-board relief, but rather require individualized inquiries to determine, not only the proper method for computing front pay, back pay,[11] and

---

[11]  Plaintiff cites the Supreme Court decision of Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 256-57 (5th Cir. 1974), for the proposition that in civil rights actions, individual back pay awards for absent class members can be sought along with injunctive and declaratory relief in a Rule 23(b)(2) class action, since such back pay awards do not constitute monetary damages, but rather are held to be equitable pecuniary relief.  (Pl.'s Mem. Supp. Mot. Class Cert. 36-37.)

> Pettway, however, is inapplicable.  As noted by the Fifth Circuit,
>
> Pettway held that back pay could be sought in a (b)(2) class action because, as an equitable remedy similar to other forms of affirmative injunctive relief permitted in (b)(2) class actions, it was an integral component of Title VII's "make whole" remedial scheme. . . . If the instant case involved only claims for equitable monetary relief, Pettway would control.  Pettway, however, did not address the availability in (b)(2) class actions of other forms of monetary relief, such as compensatory and punitive damages, nor did it have any occasion to do so.

Allison, 151 F.3d at 415-16 (internal citations and footnotes omitted).  Similarly, this case requests not only back pay, but front pay, lost pension and fringe benefits, compensatory damages for pain, suffering, humiliation and mental anguish, and punitive damages – issues not addressed by Pettway.

fringe and pension benefits for the various operator positions among the different companies involved, but also the humiliation and mental anguish compensatory damages, and the individual punitive damages. Given these circumstances, the class would become almost unmanageable, mandating multiple sub-trials to resolve all outstanding issues.

Alternatively, Plaintiff now implies that this Court has discretion under Rule 23(c)(4)(A) to certify as a class the portion of the common issues litigable under Rule 23(b)(2), excising out the non-certifiable portions, such as monetary damage claims. (See Pl.'s Mem. Supp. Mot. Class Cert. 36-37 (citing 7A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE § 1775, 470 (2d ed. 1986).) As noted above, however, the Third Circuit, has cautioned that:

> several considerations are relevant to determining '[w]hen [it is] appropriate' for a court to certify a class only 'with respect to particular issues,' . . .: the type of claim(s) and issue(s) in question; the overall complexity of the case and the efficiencies to be gained by granting partial certification; the substantive law underlying the claim(s), including any choice-of-law questions it may present; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect that resolution of the proposed issues class will have; and so forth.

Hohider, 2009 WL 2183267, at *21. In that matter, it rejected, as an abuse of discretion, the district court's partial certification of the declaratory relief and incidental damages and accompanying refusal to certify the compensatory and punitive damage issues. Id.

In this matter, aside from citing the general law regarding a district court's ability to grant partial certification, Plaintiff has neither explicitly suggested partial certification nor offered a basis on which this Court could grant partial certification. Absent a showing by Plaintiff as to

how this would affect the class going forward, the Court declines to exercise such discretion. In sum, this Court declines to find Rule 23(b)(2) satisfied.

### 2.   Rule 23(b)(3)

In order to obtain certification of a class under subsection (b)(3), a plaintiff must demonstrate both that common questions of law and fact predominate over individual questions and that a class action is superior to other available means as a device for resolution of the controversy.  FED. R. CIV. P. 23(b).  Predominance tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation, . . . a standard far more demanding than the commonality requirement of Rule 23(a), . . . requiring more than a common claim. . . . Issues common to the class must predominate over individual issues."  Hydrogen Peroxide, 552 F.3d 310-11 (internal citations and quotation marks omitted).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  Id. (quoting Newton, 259 F.3d at 172).

The superiority prong of (b)(3) then calls for a determination that a class action is the best method of achieving a "fair and efficient adjudication of the controversy."  Newton, 259 F.3d at 186.  "Superiority must be looked at from multiple points of view:  the judicial system, the potential class members, the present plaintiff, the attorneys for the public at large, the defendant, and the issues."  Chakejian, 256 F.R.D. at 501.  The relevant considerations include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

46

FED. R. CIV. P. 23(b)(3).  Ultimately, the district court must "balance, in terms of fairness and efficiency," the merits of a class action against the merits of "alternative methods of adjudication."  In re Cmty. Bank of N. Va., 418 F.3d 277, 309 (3d Cir. 2005) (citations and internal quotation marks omitted).

Plaintiff can establish neither prong.  As noted above, the putative class includes individuals denied or terminated from employment under two different SEPTA policies and approximately six separate paratransit company policies, with the employment decisions made by various companies.  No common question threads itself through such a class.

Even if Plaintiff were to define separate classes for (1) individuals denied employment as bus drivers with SEPTA directly and (2) individuals denied employment as paratransit drivers with one of the subcontractors, hurdles of predominance would still arise.  With respect to the first of these classes, Plaintiff alleges that he and other class members suffered intentional discrimination through SEPTA's implementation and maintenance (but not application) of its criminal record policy, which by its terms has a disparate impact on African-Americans, since African-Americans "are far more likely than white citizens to have a criminal record."  (Pl.'s Mem. Supp. Mot. Class Cert. 2.)  Under SEPTA's policy for its hiring of bus drivers, however, criminal record history is only one of multiple factors to be considered in the employment decision; it is not prohibitive of employment and it does not direct the termination of an individual who has already been hired notwithstanding the existence of a criminal record.  Plaintiff, by virtue of his original class definition, does not dispute that certain criminal offenses may have direct relevance to an individual's qualification to perform a bus driver position or that

47

an individual hiring may be hired notwithstanding his criminal record.  (See Pl.'s Mem. Supp.

Mot. Class Cert. 1 (defining class as those not hired or terminated as a result of a past conviction

"that has no direct relevance to that individual's competence as a bus driver or paratransit

driver.).)  Thus, certification of such a class of individuals would require the Court to probe into

each individual hiring or termination decision to inquire whether or not the individual was not

hired/terminated due solely to a criminal record or whether some other factors were involved;

whether that specific criminal record was legitimately related to the position sought; and, if not

related, whether SEPTA intentionally applied the criminal record policy to that particular

individual in order to discriminate against him or her as an African-American.  These individual

issues predominate over any possible common question and undermine the manageability and

commonality necessary for class certification.

Under SEPTA's contract with the paratransit providers, there is a greater prospect of

predominant class questions, but decentralized decisionmaking remains problematic.  First,

although all of the paratransit providers are subject to SEPTA's prohibitory provisions with

respect to criminal record history, the actual employment decisions are made by the providers

themselves.  Moreover, each of the paratransit providers had their own criminal record policies

and at least one of them had a more restrictive policy than that imposed by SEPTA.[12]  A class

---

[12]  For example, First Transit's, "System Management Plan" was significantly more
restrictive than the 2004 SEPTA contract under which it operated, as it blanketly prohibiting the
hiring of a paratransit driver that had any felony conviction, more than one moving violation in
the past two years, any drug or alcohol offense, or any misdemeanor for the past seven years.
(Brandis Decl. ¶ 6, Ex. 4.)
    The parties have failed to provide any documentation showing the plans for the other five
paratransit contractors.

including only individuals precluded from employment under SEPTA's binding contractual provision may potentially contain common questions that predominate over any individual inquiries.  A class including, as Plaintiff proposes, individuals denied employment or terminated under either SEPTA's policy or an individual subcontractor's policy, would, on the other hand, require the Court to determine which policy or policies were operative in the decisionmaking, individually address the relevant paratransit company's internal decisionmaking, and determine whether SEPTA could be held liable where its own policy was not implicated.  To that extent, individual questions would again predominate.

Finally, Plaintiff fails to prove superiority.  By way of a lengthy dissertation in his Memorandum in Support of Class Certification, Plaintiff argues that policy and the legislative history of the Civil Rights Act of 1991 counsel that civil rights actions alleging a classwide pattern of intentional and disparate impact discrimination must be entitled to class treatment under Rule 23.  He goes on to set forth a typical plaintiff's costs in litigating such an action and to describe the threat that, in the absence of class certification, there will be no private enforcement of section 1981 or Title VII in situations in which there is a broad pattern of discrimination.  Finally, he contends that the use of multiple separate trials would be "virtually certain to result in every possible permutation of inconsistent adjudications."  (Pl.'s Mem. Supp. Mot. Class Cert. 44.)

While Plaintiff's argument carries some truth on the general issue of whether employment discrimination plaintiffs face difficulties in prosecuting their claims against financially dominant defendants, he has made little showing that these broad principles apply to the specific case at bar.  First, as repeatedly indicated, the existence of multiple policies and

49

individual issues makes class determination more onerous than efficient.  Aside from the

individualized proofs from each plaintiff, Defendant would be entitled to raise individualized

defenses.  Moreover, and as discussed in detail above, Plaintiff fails to establish that the class is

so numerous that a class is the more superior method.  Indeed, Plaintiff fails to acknowledge that

if there are, in fact, only a small number of potential class members, these individuals could

jointly pursue their actions without class certification, while still retaining the benefits of shared

counsel, experts, and discovery.  Finally, given the fact that the damages sought in this case are

potentially large, a putative class member, and his or her counsel, maintain significant monetary

incentive to pursue an individual action in absence of class certification.  See Amchem, 521 U.S.

at 617 ("The policy at the very core of the class action mechanism is to overcome the problem

that small recoveries do not provide the incentive for an individual to bring a solo action

prosecuting his or her rights." (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir.

1997)).  This fact bears even more weight in light of the fact that, under 42 U.S.C. § 1988, a

prevailing party in a section 1981 action may, in the discretion of the court, obtain attorneys fees.

42 U.S.C. § 1988(b).

In short, Plaintiff cannot prove either predominance or superiority under Fed. R. Civ. P.

23(b).  Accordingly, the Court declines to find this section satisfied.

## IV.   CONCLUSION

As Plaintiff has failed to make the requisite showings under Federal Rule of Civil

Procedure 23, the Court is bound to deny class certification.  This denial is not preclusive of any

further action by Plaintiff.  Nor does this denial reflect on the merits of Plaintiff's individual

claim.  Rather, it merely indicates that this claim is best pursued separately and in a more

individualized fashion, instead of as part of larger class.